**F I L E D**

JUN 2 4 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  JAMES G. KREISSMAN (Bar No. 206740)
   jkreissman@stblaw.com
2  SIMPSON THACHER & BARTLETT LLP
   2550 Hanover Street
3  Palo Alto, California 94304
   Telephone: (650) 251-5000
4  Facsimile: (650) 251-5002

5  Attorneys for Defendants Richard S. Fuld,
   Jr., Christopher M. O'Meara, Joseph M.
6  Gregory, Ian Lowitt, David Goldfarb, John
   F. Akers, Roger S. Berlind, Marsha Johnson
7  Evans, Roland A. Hernandez and Henry
   Kaufman
8

*E-filing*

9                          UNITED STATES DISTRICT COURT

10                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                              SAN FRANCISCO DIVISION

12
   CONTRA COSTA WATER DISTRICT,
13
                    Plaintiff,        CV 09-09          **2801**
14
            v.                        Removed from:
15
   RICHARD S. FULD, JR., CHRISTOPHER M.     Superior Court of the State of California,
16 O'MEARA, JOSEPH M. GREGORY, ERIN         County of San Francisco
   CALLAN, IAN LOWITT, DAVID GOLDFARB,
17 JOHN F. AKERS, ROGER S. BERLIND,         Civil No. CGC-09-489381
   MARSHA JOHNSON EVANS, ROLAND A.
18 HERNANDEZ, HENRY KAUFMAN, ERNST &
   YOUNG LLP, and DOES 1 through 20,       **NOTICE OF REMOVAL**
19
                    Defendants.
20

21      PLEASE TAKE NOTICE that Defendants Richard S. Fuld, Jr., Christopher M.

22 O'Meara, Joseph M. Gregory, Ian Lowitt, David Goldfarb, John F. Akers, Roger S. Berlind,

23 Marsha Johnson Evans, Roland A. Hernandez, and Henry Kaufman (collectively, the "Removing

24 Defendants"), pursuant to 28 U.S.C. §§ 1334(b), 1367, 1441, 1446 and 1452, hereby remove the

25 entire above-captioned civil action, and all claims and causes of action therein, from the Superior

26

27

28

                                    - 1 -

1  Court of the State of California, County of San Francisco, to the United States District Court for

2  the Northern District of California, San Francisco Division.[1]

3        As grounds for removal, Removing Defendants state as follows:

4      1.    On or about June 12, 2009, Plaintiff Contra Costa Water District ("Contra Costa")

5  filed this action in the Superior Court of the State of California, San Francisco County. This case

6  was assigned an index number of CGC-09-489381.[2]

7      2.    On June 17, 2009, counsel for Removing Defendants accepted service for

8  Removing Defendants of the summons and complaint in this action.

9      3.    Thus, this Notice is being filed within thirty days of service on the Removing

10  Defendants and is timely filed under 28 U.S.C. § 1446(b).

11      4.    Other defendants named in this action – Erin Callan and Ernst & Young LLP –

12  consent to this Notice and seek the removal of this action to the United States District Court for

13  the Northern District of California, San Francisco Division.

14      5.    Plaintiff Contra Costa alleges that it is an "independent special district public

15  agency" which manages its own investments "on a pooled basis." Complaint ¶ 22. Plaintiff

16  further alleges that it invested in Lehman Brothers Holdings Inc. ("Lehman") securities and

17  suffered losses on such investments as a result of reliance on defendants' "misrepresentations and

18  omissions." *See* Complaint ¶¶ 23, 57. Plaintiff asserts causes of action for violations of Sections

19  11 and 15 of the Securities Act of 1933, fraud and deceit, negligent misrepresentation, breach of

20  fiduciary duty, and violations of California Corporations Code § 25400 *et seq*. *See* Complaint ¶¶

21  164-208.

22

23  [1]   By removing this matter, Removing Defendants do not waive, and expressly preserve, any

24  and all defenses that they may have, including, but not limited to, lack of personal
jurisdiction.

25  [2]   This action is similar to 10 prior actions filed in California state court and subsequently

26  removed to federal court. The Judicial Panel on Multidistrict Litigation ("JPML") has
centralized those actions, with 23 others, in the United States District Court for the

27  Southern District of New York. In certain of those actions the plaintiffs filed motions for
remand to state court, which motions were denied. Defendants expect that the JPML will

28  transfer this action to the Southern District of New York as well.

6. Removal is appropriate here because this Court maintains bankruptcy "related to" jurisdiction, pursuant to 28 U.S.C. §§ 1334(b) and 1452(a). In addition, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 for any claims or parties not subject to jurisdiction under § 1334 because all claims against all parties in this case form part of the same case or controversy.

**Bankruptcy "Related To" Jurisdiction**

7. On September 15, 2008, Lehman, the issuer of the securities that are the subject of this action and the corporation for which the individual defendants serve or served as officers or directors, filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (the "Lehman Bankruptcy Proceedings"). *See* Complaint ¶ 15. The Lehman Bankruptcy Proceedings are currently pending before U.S. Bankruptcy Judge James M. Peck.

8. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1334(b), which provides that United States district courts shall have jurisdiction over all civil proceedings, *inter alia*, "related to cases under title 11 [the United States Bankruptcy Code]." This action may be removed to this Court by Defendants under 28 U.S.C. § 1452(a), which provides for removal of an action to a district court if it has original jurisdiction under § 1334, because this action is "related to" a case under Chapter 11, namely the Lehman Bankruptcy Proceedings.

9. This action is "related to" the Lehman Bankruptcy Proceedings, and is therefore removable to this Court pursuant to 28 U.S.C. § 1452(a), because the outcome of this case will have a conceivable effect on the Lehman bankruptcy estate. An action is "related to" a bankruptcy proceeding if "*the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy.*" *In re Feitz*, 852 F.2d 455, 457 (9th Cir.1988) (emphasis in original) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984)); *see also In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) ("The test . . . is whether [the litigation's] outcome might have any 'conceivable effect' on the bankrupt estate.").

1     10.    An action is "related to" a bankruptcy proceeding even when the claims are

2 between third parties. *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995) (resolving a circuit split by

3 holding that a dispute between parties other than the debtor may be "related to" bankruptcy

4 although the debtor has no interest in the property over which the parties are in dispute).

5     11.    This action relates to Lehman's bankruptcy rights because (i) Lehman was the

6 issuer of the securities that are the subject of the action, (ii) certain Defendants have claims to

7 indemnification for defense costs and expenses from Lehman in the event a judgment is entered

8 against them in this action, (iii) at least certain, if not all, Defendants have claims to contribution

9 from Lehman in the event a judgment is entered against them in this action, and (iv) certain

10 Defendants have rights to coverage under directors and officers insurance policies issued to

11 Lehman, pursuant to which policies Lehman directors and officers' defense costs in similar

12 litigation is being paid with the approval of the Bankruptcy Court, *see* Ex. A.

13     12.    Courts have regularly found that third party proceedings are "related to"

14 bankruptcy proceedings when the defendants have a claim for indemnification or contribution

15 against the debtor estate or a claim to coverage under insurance provided by the bankrupt

16 corporation, even where their rights are contingent or merely potential. *See Carpenters Pension*

17 *Trust For S. Cal. v. Ebbers*, 299 B.R. 610, 612-13 (C.D. Cal. 2003) (denying motion to remand

18 and finding potential for indemnification claims against bankruptcy estate sufficed for "related to"

19 jurisdiction); *Pac. Life Ins. Co. v. J.P. Morgan Chase & Co.*, No. 03-CV-813, 2003 WL

20 22025158, at *1 (C.D. Cal. June 30, 2003) (holding that claims of contribution and

21 indemnification, even where contingent, established "related to" jurisdiction); *In re WorldCom,*

22 *Inc. Secs. Litig.*, 293 B.R. 308, 321 (S.D.N.Y. 2003) ("Because the effect of contribution claims

23 on the bankruptcy estate is at the very least 'conceivable,' the . . . action is related to the

24 bankruptcy and subject to the jurisdiction of this Court."); *Kennilworth Partners II LP v. Crisman*,

25 No. 00-CV-3218, 2001 WL 30534, at *3 (N.D. Cal. Jan. 3, 2001) (holding that case is "related to"

26 a bankruptcy where "any recovery by plaintiff would be subject to defendants' indemnification

27 claims under [the bankrupt corporation's] bylaws and claims for coverage under the [bankrupt]

28 corporation's directors and officers insurance policy); *In re Sizzler Rests. Intl., Inc.*, 262 B.R. 811,

818-819 (Bankr. C.D. Cal. 2001) (holding that employee indemnification provides an adequate basis for "related to" jurisdiction even though indemnification was conditioned on a subsequent proceeding); *In re Masterwear Corp.*, 241 B.R. 511, 516-17 (Bankr. S.D.N.Y. 1999) (holding that "related to" jurisdiction existed where defendants "may ultimately be entitled to recover some or all of their legal fees and expenses from [the bankrupt corporation] under [its] bylaws").

13.     For any claims or parties not subject to jurisdiction under 28 U.S.C. § 1334, supplemental jurisdiction lies under 28 U.S.C. § 1367 because all claims against all parties in this case form part of the same case or controversy.

**Other Procedural Requirements**

14.     This is not a core proceeding under 28 U.S.C. § 157(b).  Removing Defendants do not consent to entry of final orders or judgment by any bankruptcy judge.

15.     In accordance with 28 U.S.C. § 1446, Exhibit B includes copies of all process, pleadings and orders served upon Removing Defendants in this action.

16.     Removing Defendants will promptly serve a copy of the Notice of Removal on Plaintiff's counsel and file with the Clerk of the Superior Court of the State of California, San Francisco County, a Notice of Filing of Notice of Removal pursuant to 28 U.S.C. § 1446(d).

17.     This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11 and Bankruptcy Rule 9011.

WHEREFORE, the Removing Defendants remove this action in its entirety from

1    the Superior Court of the State of California, San Francisco County, to the United States District

2    Court for the Northern District of California, San Francisco Division.

3    Dated: June 24, 2009

SIMPSON THACHER & BARTLETT LLP

By                              
        James G. Kreissman

*Attorneys for Removing Defendants Richard S. Fuld, Jr., Christopher M. O'Meara, Joseph M. Gregory, Ian Lowitt, David Goldfarb, John F. Akers, Roger S. Berlind, Marsha Johnson Evans, Roland A. Hernandez and Henry Kaufman*

Notice of Removal

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |
| | : | |

-------------------------------------------------------------x

## ORDER GRANTING DEBTORS' MOTION, PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE, FOR AN ORDER MODIFYING THE AUTOMATIC STAY TO ALLOW ADVANCEMENT UNDER DIRECTORS AND OFFICERS AND FIDUCIARY LIABILITY INSURANCE POLICIES

Upon the motion, dated February 26, 2009 (the "Motion"), of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced

chapter 11 cases, as debtors and debtors-in-possession (collectively, the "Debtors" and,

together with their non-debtor affiliates, "Lehman"), pursuant to section 362(d) of title 11

to the United States Code (the "Bankruptcy Code") and Rule 4001(a)(3) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order modifying the

automatic stay, to the extent applicable, to allow the Debtors' third party insurance

companies to pay covered defense costs, advance covered defense costs, or both incurred

by the Debtors' present and former officers and directors as well as certain employees,

fiduciaries and administrators of LBHI's sponsored ERISA employee benefit plans (the

"Individual Defendants") that have been named as defendants in the Legal Proceedings[1],

all as more fully described in the Motion; and the Court having jurisdiction to consider

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the amended order entered February 13, 2009 governing case management and administrative procedures [Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that pursuant to sections 105(a) and 362(d) of the Bankruptcy Code, the automatic stay, to the extent applicable, is hereby modified to, and without further order of this Court, allow payment of covered defense costs, advancement of covered defense costs, or both from the Debtors' third party insurance companies to the

2

Individual Defendants pursuant to the terms of the Policies; and it is further

ORDERED the Debtors are authorized to execute all the documentation necessary to allow the third party insurance companies to pay covered defense costs, advance covered defense costs, or both incurred by the Individual Defendants in the Legal Proceedings; and it is further

ORDERED that nothing in this Order shall modify or alter the rights and obligations provided for under the terms and conditions of the Policies; and it is further

ORDERED that all parties to the Policies reserve all rights and defenses that they would otherwise have; and it is further

ORDERED that nothing in this Order shall constitute a determination that the proceeds of the Policies are property of the Debtors' estates, and the rights of all parties in interest to assert that the proceeds of the Policies are, or are not, property of the Debtors' estates are hereby reserved; and it is further

ORDERED that the ten day stay provided by Bankruptcy Rule 4001(a)(3) is waived; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: New York, New York
March 25, 2009

> _s/ James M. Peck_
> UNITED STATES BANKRUPTCY JUDGE

3

# Exhibit B

1 | JOSEPH W. COTCHETT (36324)
MARK C. MOLUMPHY (168009)
2 | NANCI E. NISHIMURA (152621)
LAURA SCHLICHTMANN (169699)
3 | **COTCHETT, PITRE & McCARTHY**
840 Malcolm Road, Suite 200
4 | Burlingame, California 94010
Telephone: (650) 697-6000
5 | Fax: (650) 697-0577

6 | *Attorneys for Plaintiff Contra Costa Water District*

ENDORSED
**F I L E D**
San Francisco County Superior Court

JUN 12 2009

GORDON PARK-LI, Clerk
BY:_____PARAM NATT_____
Deputy Clerk

7

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **IN AND FOR THE COUNTY OF SAN FRANCISCO**

CGC·09·489381

10 | **CONTRA COSTA WATER DISTRICT,**

11 | **Plaintiff,**

vs.

12 |

13 | **RICHARD S. FULD, JR.,**
**CHRISTOPHER M. O'MEARA,**
**JOSEPH M. GREGORY,**
14 | **ERIN CALLAN,**
**IAN LOWITT,**
15 | **DAVID GOLDFARB,**
**JOHN F. AKERS,**
16 | **ROGER S. BERLIND,**
**MARSHA JOHNSON EVANS,**
17 | **ROLAND A. HERNANDEZ,**
**HENRY KAUFMAN,**
18 | **ERNST & YOUNG LLP,**
**and DOES 1 through 20,**

19 |

**Defendants.**

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

**CIVIL ACTION NO.:**

**COMPLAINT FOR:**

1. **Fraud and Deceit**

2. **Negligent Misrepresentation**

3. **Breach of Fiduciary Duty**

4. **Violations of Calif. Corp. Code §**
   **25400 *et seq.*;**

5. **Violation of § 11 of the Securities Act**

6. **Violation of § 15 of the Securities Act**

**JURY TRIAL DEMANDED**

CASE MANAGEMENT CONFERENCE ON:

NOV 1 3 /1117 -9½ AM

DEPARTMENT 212

28 |

⊕
LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

Complaint

**TABLE OF CONTENTS**

page

I.     INTRODUCTION ............................................................. 1

OVERVIEW ................................................................... 1

THE SCHEME ................................................................. 1

INTERNAL WARNINGS ...................................................... 3

THE ROLE OF ERNST & YOUNG ............................................ 4

LEHMAN DISCLOSURES .................................................... 5

THE END OF LEHMAN ..................................................... 6

THE DISTRICT'S LOSSES .................................................. 6

II.     JURISDICTION AND VENUE ............................................... 6

III.    THE PARTIES ................................................................. 8

    A.     Plaintiff ................................................................. 8

    B.     Defendants ............................................................. 8

          1.     Officer Defendants ............................................. 8

          2.     Finance and Risk Committee Defendants ......................... 10

    C.     Auditor Defendant ..................................................... 11

    D.     Doe Defendants ....................................................... 12

    E.     Agents and Co-Actors .................................................. 12

    F.     Unnamed Participants .................................................. 12

IV.    FACTUAL ALLEGATIONS ................................................... 13

    A.     The District And Its Investments ...................................... 13

          1.     State Law Authority And Requirements ......................... 13

          2.     The Structure And Investment Policy Of The District .............. 14

    B.     The Development of The Mortgage Securitization Industry ............... 15

          1.     Increasing Use of Sub-Prime Loans ............................. 15

⊗
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

|   |   | 2. | The Practice Of Pooling Risky Mortgages As A Security . . . . . . . . . . . 16 |

| C. | Lehman Emerges As The Industry Leader In Mortgage-Backed Securities . . . . 18 |

| D. | As the Mortgage Market Deteriorates, Lehman's Risk Exposure Multiplies . . . 21 |

| E. | Lehman's SEC Filings And Related Market Reports, Reviewed And Audited by E&Y, Failed To Disclose Lehman's Increasing Exposure To Mortgage-Related Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27 |

| F. | The Central Role Of Ernst & Young . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38 |

V.   CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

FIRST CAUSE OF ACTION
(Fraud and Deceit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

SECOND CAUSE OF ACTION
(Negligent Misrepresentation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

THIRD CAUSE OF ACTION
(Breach of Fiduciary Duty) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

FOURTH CAUSE OF ACTION
(Violation of California Corporations Code § 25400 *et seq.*) . . . . . . . . . . . . . . . 51

FIFTH CAUSE OF ACTION
(Violations of Section 11 of the Securities Act) . . . . . . . . . . . . . . . . . . . . . . . . 52

SIXTH CAUSE OF ACTION
(For Violations of Section 15 of the Securities Act) . . . . . . . . . . . . . . . . . . . . . . 53

VI.   PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

VII.   DEMAND FOR JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1    Plaintiff **Contra Costa Water District** ("Plaintiff" or the "District") alleges the

2 following based on the investigation conducted by the District and its counsel, a review and

3 analysis of **Lehman Brothers Holdings, Inc.'s** ("Lehman" or the "Company") and **Ernst &**

4 **Young LLP's** ("E&Y") filings with the United States Securities and Exchange Commission (the

5 "SEC"), news articles and other media reports, press releases, interviews, and other matters of

6 record.

7 **I. INTRODUCTION**

8               **OVERVIEW**

9   1.   This case represents the worst example of the fraud committed by modern day

10 robber barons of Wall Street, who targeted public entities to finance their risky practices and then

11 paid themselves hundreds of millions of dollars in compensation while their companies

12 deteriorated. At Lehman, as investors like the District were losing millions, Chief Executive

13 Officer Richard Fuld reportedly took out almost **$500 million**, purchasing a lavish **multi-million**

14 **dollar home** (10,000 sq. ft.) in Greenwich, Connecticut, a **$21 million** apartment on Park

15 Avenue in New York, a **$13 million** beachfront vacation home in Florida, a **million dollar** ski

16 house in Sun Valley, Idaho, and a **multi-million dollar** art collection. Others in Lehman's

17 executive management took out lucrative bonuses paid in the years before the Company's

18 collapse, while committing a fraud. Lehman had the audacity to ask the U.S. Taxpayers for

19 assistance in September 2008, just before filing for bankruptcy.

20             **THE SCHEME**

21   2.   As described herein, **Lehman**, aided and abetted by its **Executives**, the Individual

22 Defendants herein, and its long-time auditor, **E&Y**, were able to raise billions of dollars from

23 investors and continue to artificially inflate the value of its bonds by concealing Lehman's

24 increasingly dangerous exposure from its low grade mortgage portfolio and its refusal to properly

25 value its assets. Quite the contrary, Defendants repeatedly distinguished Lehman from other

26 firms by emphasizing its strong capital base and superior risk management practices.

27

28

⊕
LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

3.     Lehman was a major participant in the mortgage and real estate markets, originating residential and commercial mortgages, securitizing loans, marketing various asset-backed instruments, and investing directly in real estate.  However, Lehman knew as early as 2005 that trouble was ahead given its sub-prime real estate exposure.

4.     In 2006 and 2007, the real estate and mortgage markets were in the midst of an unprecedented meltdown that adversely affected the market value of real estate and mortgage assets.  Hundreds of companies with mortgage exposure, like Citigroup, Merrill Lynch, Morgan Stanley, Bear Stearns, and UBS, booked enormous gross losses related to their mortgage assets and the credit squeeze in 2007.  For example, in June 2007, Bear Stearns announced that it would provide $3.2 billion to two of its hedge funds after they experienced significant mortgage-related losses.  Those funds collapsed in July after incurring additional losses on their mortgage positions.

5.     However, Lehman's 2006 and 2007 financial reports, signed off by **E&Y**, hid the Company's exposure to mortgage-related losses.  For instance, despite the severe conditions in the real estate and mortgage markets during the second quarter of 2007 (ending May 31, 2007), Lehman's SEC filings disclosed no gross writedowns of its real estate and mortgage-related assets during the quarter, but instead reported that the Company increased its holdings of such assets.  Likewise, when reporting its third quarter 2007 results on September 18, 2007, Lehman failed to disclose material information regarding its internal gross writedowns of its real estate mortgage portfolio.  When specifically asked for a breakdown of the gross versus net writedowns associated with the mortgage assets, Defendant Christopher O'Meara, the Chief Financial Officer at the time, refused to provide the information: "**[K]nowing the gross numbers particularly in that business, I don't think is really a meaningful thing.**"

6.     Lehman's lack of disclosure and false reports were particularly misleading with respect to its exposure to so-called "Alt-A" investments.  The term "Alt-A" is supposed to describe a mortgage that has a risk profile between prime and subprime.  However, Lehman's Alt-A portfolio was largely comprised of high-risk loans that did not resemble conventional Alt-

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1 | A loans and were in fact more similar to subprime. Lehman's reports disclosed no meaningful
2 | information about its Alt-A portfolio. Even when Lehman, in its Form 10-Q for the first quarter
3 | of 2008, first included a separate line item for "Alt-A," it lumped together Alt-A holdings with
4 | "prime" holdings.

5 | 7. Lehman, through its Executives, claimed that its superior risk management
6 | practices "hedged" against losses in its real estate and mortgage portfolio. However, the
7 | Defendants disclosed no meaningful information about its supposed "economic hedges" – such
8 | as how much of its portfolio the Company had hedged, the dollar amount of total holdings, what
9 | percentage was hedged, and the specific financial instruments used to hedge mortgage-backed
10 | assets. In truth, Lehman's "economic hedges" presented an undisclosed risk of additional losses
11 | from the hedges themselves.

12 | 8. Lehman, through its Executives, and with the consent of E&Y, knowingly took
13 | inadequate writedowns and claimed superior risk management practices. Lehman reported
14 | record profits for fiscal year 2007, including net income of $877 million for the fourth quarter of
15 | 2007, and with the knowledge of E&Y, gave lucrative bonuses to its executives. The Defendants
16 | also raised over $30 billion from investors through offerings of debt and equity securities.
17 | Unlike a retail bank, Lehman, as an investment bank, did not have a large deposit base and had to
18 | raise capital from independent sources for investment and liquidity purposes to replace losses.
19 | After raising approximately $1.9 billion in a preferred share offering that "took care of our full-
20 | year needs," shortly thereafter, Lehman raised an additional $4 billion through a preferred share
21 | offering in April 2008.

22 | **INTERNAL WARNINGS**

23 | 9. Internally, Lehman's executives acknowledged that warning signs were
24 | evident and that management had not moved "early/fast enough." An internal presentation, for
25 | example, indicated that "[v]ery few of the top financial issuers have been able to escape damage
26 | from the subprime fallout" and warned that "a small number of investors account for a large
27 | portion of demand [for Lehman issues], liquidity can disappear quite fast." Another internal

28

❋
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

3

1 memorandum recognized that conditions were "clearly not sustainable," that Lehman "saw
2 warning signs" as the firm remained in "illiquid asset [origination] too much/too long," that
3 Lehman "behaved too much [like] investors, not traders" and practiced undisciplined capital
4 allocation. See Exhibits A and B attached hereto.

## THE ROLE OF ERNST & YOUNG

6     10.    The fraudulent scheme, described in detail herein, occurred as one of the
7 country's largest accounting firms, E&Y, chose to look the other way and give its stamp of
8 approval to Lehman's financial condition and risk exposure, rather than risk losing lucrative
9 accounting and auditing fees – estimated at $31 million in 2007 alone. The exceptionally large
10 fees were allegedly earned by E&Y for diligently auditing Lehman's financial statements and the
11 transactions underlying the numbers, providing the public investors – the intended beneficiaries
12 of E&Y's audit reports – with the assurance of a legitimate operation while other competitors
13 were taking substantial writedowns. Following its audits, E&Y issued unqualified audit reports
14 on the annual financial statements of Lehman, and its internal controls, and continued to review
15 its quarterly financial statements, as well as the press releases regarding the financial status of the
16 Company. Yet, the auditor violated its most basic professional and contractual duties, as well as
17 generally accepted accounting principles ("GAAP") and generally accepted auditing standards
18 ("GAAS").

19     11.    As Lehman was increasing its leverage position, it expanded its real estate
20 and mortgage portfolio, reaching over thirty times shareholder equity by the end of the first
21 quarter of 2008. The Individual Defendants, with the knowledge and consent of E&Y, falsely
22 assured investors, including the District, that its exposure was well contained and that it had
23 hedged against losses. For example, when two Bear Stearns hedge funds failed in July 2007,
24 Lehman spokesperson Kerrie Cohen stated on July 18, 2007: "The rumors regarding [Lehman's]
25 subprime exposure are totally unfounded." In truth, as known by E&Y, Lehman had just
26 originated billions in additional risky subprime loans.

27

28

**LEHMAN DISCLOSURES**

12. On <u>June 9, 2008</u>, before the markets opened, Lehman announced $700 million in additional losses due to ineffective hedges and a net loss of approximately $5.14 per share for the second quarter of 2008. Lehman's Chief Executive Officer and Chairman, Defendant Richard Fuld, replaced the Company's President, Defendant Joseph Gregory, and demoted Defendant Erin Callan, who later left. Fitch, Inc. ("Fitch") and Moody's Investor Services ("Moody's") downgraded Lehman's credit rating, and the price of Lehman's common stock fell, closing down nearly 9% to $29.48.

13. The <u>June 9, 2008</u> announcement only partially revealed the relevant truth, however, and Lehman raised an additional $6 billion through the offering of common and preferred shares immediately following the announcement. Lehman's management continued to mislead investors about Lehman's massive exposure. By September 9, 2008, Lehman executives internally calculated that the Company required at least $3 billion in additional capital. That same day, JPMorgan's co-CEO, Steve Black, telephoned Defendant Fuld and demanded $5 billion from Lehman to cover lending positions. With regard to the value of Lehman's assets, Wall Street executives who privately reviewed Lehman's real estate portfolio in September 2008 figured out immediately that they were overvalued by billions of dollars, with Lehman's $32.6 billion in commercial real estate holdings overvalued by 35% or more. Neither Lehman nor E&Y had ever disclosed this before.

14. On <u>September 10, 2008</u>, less than three months <u>after</u> the $6 billion offerings, Defendants Fuld and Ian Lowitt held a conference call and assured investors that the Company did not need additional capital. In an earnings pre-release, they reported a $3.9 billion loss for the third quarter of 2008, as well as $7 billion in gross writedowns on its residential and commercial real estate holdings. In announcing the results during the conference call, Defendant Lowitt, who replaced Callan as Chief Financial Officer, stated that "[t]he majority of our write-downs were in Alt-A driven by an increase in Alt-A delinquencies and loss expectations which were specific to Alt-A prices and did not affect the performance of our hedges." Contrary to

1  Defendants' earlier statements, Lowitt continued: "[U]nfortunately, there is no direct hedge for
2  Alt-A assets . . ." On this news, Lehman's shares declined 7% from the prior day's close to $7.25
3  per share.

**THE END OF LEHMAN**

5      15.     By <u>September 15, 2008</u>, Lehman's share price declined over 94% from the
6  previous day to $0.21 per share. Before the markets opened on September 15, 2008, Lehman
7  filed its petition for bankruptcy – the largest corporate bankruptcy in the history of the United
8  States. Bankruptcy proceedings are underway, and Lehman is in the process of selling assets to
9  satisfy its creditors. The asset sales have been at fractions of book value or previously assumed
10 levels of value. In the aftermath, the Federal Bureau of Investigation ("FBI"), as well as the
11 United States Department of Justice, are investigating Lehman and its senior executives for
12 securities fraud and criminal conduct.

**THE DISTRICT'S LOSSES**

14     16.     Public investors, such as the District, which purchased Lehman notes in February
15 2008, have been left in Defendants' ruinous wake. While the Individual Defendants paid
16 themselves millions in compensation, the District suffered millions in losses from its investments
17 in Lehman.

18 **II.     JURISDICTION AND VENUE**

19     17.     Plaintiff, the Contra Costa Water District, is an independent special district public
20 agency, created and existing under California's County Water District Law (Water Code §§ 3000
21 et seq.). The District was formed in 1936 and is now one of the largest urban water districts in
22 California, delivering water to approximately 550,000 people in Contra Costa County in
23 Northern California. The District is governed by an elected five-person Board of Directors which
24 approves the District's audit, budget and investment policy, in accordance with California law,
25 policy and general direction. The District held and continues to hold the Lehman note that it
26 purchased in February 2008 in its custodial account in California.

27

28

1        18.     Each Defendant has sufficient contacts with California, is a citizen of

2 California, or otherwise purposefully avails himself or herself of benefits from California or has

3 property in California so as to render the exercise of jurisdiction over each by the California

4 courts consistent with traditional notions of fair play and substantial justice. Prior to its

5 bankruptcy, Lehman conducted substantial business in California, including holding investor

6 seminars and conferences and employee meetings in California. Lehman maintained several

7 offices in California, including an office at 555 California Street in San Francisco, where its

8 agents offered and sold debt and equity securities to investors. E&Y also conducted substantial

9 business in California, and presently maintains several offices in California, including an office

10 at 560 Mission Street in San Francisco.

11        19.     The amount in controversy exceeds the jurisdictional minimum of this Court.

12        20.     This action is not preempted by the federal Securities Litigation Uniform

13 Standards Act of 1998 ("SLUSA"), as this action is not a class action and is brought by a single

14 plaintiff seeking damages. The claims are brought under California law, including California

15 Corporations Code § 25400 *et seq.*, which prohibits knowing or intentionally false or misleading

16 statements in connection with the sale of a security, and California common law. The claims are

17 also brought under Section 11 of the Securities Act, 15 U.S.C. § 77k, and § 15 of the Securities

18 Act, 15 U.S.C. § 77o. California courts have jurisdiction over claims under § 11 and § 15 of the

19 Securities Act pursuant to 15 U.S.C. § 77v(a), and such claims are not subject to removal.

20        21.     Venue is proper in this Court as many of the acts and transactions that constitute

21 violations of law complained of herein, including Lehman's dissemination of untrue statements

22 of material facts about the Lehman securities to the public investors, occurred in San Francisco.

23 The District held and continues to hold the bonds in its custodial account in California.

24

25

26

27

28

❀
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

III.    **THE PARTIES**

   A.    **Plaintiff**

22.    The District is an independent special district public agency, created and existing under California's County Water District Law. As a special district public agency, the District relies primarily on user fees to fund its operating budget. In addition to operating costs, the District maintains an ongoing capital improvement program, which largely influences how the District budgets and sets its rates. District investment policy strictly adheres to the California Government Code and all California Statutes. The District manages all of its investments on a pooled basis. All investments are in compliance with the District's investment policy.

23.    In reliance on Defendants' misrepresentations and omissions, the District purchased and held substantial interest in a Lehman note, as described below, in California. As a result, the District has suffered substantial losses.

   B.    **Defendants**

      1.    **Officer Defendants**

24.    Defendant **Richard S. Fuld, Jr.**, ("Fuld") joined Lehman in 1969. He has served as Chairman of the Board of Directors of Lehman and Lehman Brothers Inc. ("LBI") since April 1994 and Chief Executive Officer ("CEO") of Lehman and LBI since November 1993.

25.    Defendant **Christopher M. O'Meara** ("O'Meara") served as Lehman's Chief Financial Officer ("CFO"), Controller, and Executive Vice President from 2004 until December 1, 2007. O'Meara joined Lehman in 1994, and prior to serving as CFO, operated as Lehman's Global Controller. As Controller, O'Meara supervised Lehman's internal accounting programs and procedures. In his role as the head of Risk Management, O'Meara was also responsible for supervising Lehman's risk mitigation strategies and procedures. Beginning on December 1, 2007, O'Meara served as the head of Worldwide Risk Management.

26.    Defendant **Joseph M. Gregory** ("Gregory") joined Lehman in 1974 as a commercial paper trader. Gregory ultimately served as Lehman's President and Chief Operating Officer ("COO") from May 2004 until he resigned in June 2008. Gregory, in his role as COO,

❸
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

8

1  oversaw the day-to-day management of Lehman's operations. From April 2000 until May 2002,
2  Gregory was Lehman's Chief Administrative Officer, and from 1996 to April 2000, Gregory was
3  head of Lehman's Global Equities Division, in charge of the overall equities business. From
4  1991 to 1996, Gregory served as co-head of Lehman's Fixed Income Division. From 1980 to
5  1991, Gregory held various management positions in the Fixed Income Division, including head
6  of Lehman's mortgage business.

7      27.   Defendant **Erin Callan** ("Callan") joined Lehman in 1995 and served as
8  Lehman's CFO and Global Controller from December 2007 until she resigned in June 2008.
9  Callan served in various capacities at the Company, including head of the Investment Banking
10  Global Hedge Fund Coverage Group, the Global Finance Solutions Group and Global Finance
11  Analytics Group.

12      28.   Defendant **Ian Lowitt** ("Lowitt") joined Lehman in 1994. He ultimately replaced
13  Callan as CFO in June 2008 and also served as the Co-Chief Administrator Officer, overseeing
14  Lehman's finance organization, including Financial Control, Investor Relations, Planning and
15  Analysis, Product Control, Tax, and Treasury. In his role as Co-Chief Administrative Officer,
16  he was responsible for the global oversight of Risk Management. Lowitt served as Treasurer and
17  Global Head of Tax from 2000 until 2005.

18      29.   Defendant **David Goldfarb** joined Lehman in 1993, after 14 years in Ernst &
19  Young's Financial Services practice, where he was a partner. He became the firm's Global
20  Controller in 1995. In 1998, he was named Chief Financial Officer of LBI and in April 2000, he
21  was promoted to Chief Financial Officer of Lehman. He served in that capacity until 2004, and
22  regularly participated in making statements to the public market about Lehman. For example, in
23  September 2004, Goldfarb spoke at the Annual Investment Conference at the Ritz-Carlton Hotel
24  in San Francisco and discussed Lehman's performance and future outlook. In 2004, Goldfarb
25  was promoted to Chief Administrative Officer, responsible for Finance, Risk Management and
26  Investor Relations and, in addition, oversaw Strategy, Technology and Operations, Corporate
27  Communications and Corporate Real Estate. Defendant O'Meara, the then CFO, reported to

28

1  Goldfarb. In 2006, Goldfarb served as the global head of Strategic Partnerships, Principal

2  Investing and Risk. In June 2008, Goldfarb assumed the position of Chief Strategy Officer.

3       30.    Defendants Fuld, O'Meara, Gregory, Callan, Lowitt and Goldfarb are collectively

4  referred to herein as the "Officer Defendants." All of the Officer Defendants served on

5  Lehman's Executive Committee, chaired by Defendant Fuld. The Executive Committee was

6  responsible for assessing Lehman's risk exposure and related disclosures. The Executive

7  Committee reportedly met twice a week for two hours at a time and devoted a significant amount

8  of that time to discussions about managing risk. Thus, the Executive Committee was intimately

9  familiar with the risk that Lehman took on in all the different areas of its business.

10              **2.    Finance and Risk Committee Defendants**

11      31.    Defendant **John F. Akers** ("Akers") was at all relevant times a director of

12  Lehman. Akers joined Lehman's Board in 1996, and served as the Chairman of the

13  Compensation and Benefits Committee and a member of the Finance and Risk Committee.

14      32.    Defendant **Roger S. Berlind** ("Berlind") was at all relevant times a director of

15  Lehman. Berlind was also a director of LBI. Berlind joined Lehman's Board in 1985, and also

16  served as a member of the Audit Committee and the Finance and Risk Committee.

17      33.    Director **Marsha Johnson Evans** ("Evans") was at all relevant times a director of

18  Lehman. Evans joined Lehman's Board in 2004. She served as Chairperson of the Nominating

19  and Corporate Governance Committee, a member of the Compensation and Benefits Committee,

20  and a member of the Finance and Risk Committee.

21      34.    Defendant **Roland A. Hernandez** ("Hernandez") was at all relevant times a

22  director of Lehman. Hernandez joined Lehman's Board in 2005. He served on the Finance and

23  Risk Committee. Hernandez is a resident of California.

24      35.    Defendant **Henry Kaufman** ("Kaufman") was at all relevant times a director of

25  Lehman. Kaufman joined Lehman's Board in 1995. For 26 years, Kaufman was with Salomon

26  Brothers Inc., where he was a Managing Director, Member of the Executive Committee, and in

27

28

**⊕**
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  charge of Salomon's four research departments. Kaufman served as the Chairman of the Finance
2  and Risk Committee.

3      36.    Defendants Akers, Berlind, Evans, Hernandez and Kaufman are collectively
4  referred to herein as the "Risk Committee Defendants." The Officer Defendants and the Risk
5  Committee Defendants are collectively referred to herein as the "Individual Defendants" or
6  "Defendants." All of the Risk Committee Defendants sat on the Finance and Risk Committee,
7  which was charged with the responsibility to review and advise the Board of Directors on the
8  financial policies and practices of the company, and particularly risk management. The
9  Committee also was supposed to review major capital expenditure programs and significant
10  capital transactions and the respective risks that they entailed. The Committee reportedly met
11  only twice in 2007 and early 2008, as Lehman's risk exposure grew exponentially.

12      37.    The Individual Defendants, because of their senior positions at Lehman, were
13  controlling persons of the Company and possessed the power and authority to control the
14  contents of Lehman's reports to the SEC, press releases, and presentations to securities analysts,
15  money and portfolio managers, institutional investors, and individual investors such as the
16  District – *i.e.*, the market.

17  ## C. **Auditor Defendant**

18      38.    Defendant **Ernst & Young LLP** ("E&Y") is a public accounting firm with
19  offices throughout the world, including in San Francisco, California. E&Y served as Lehman's
20  outside auditor for years and at all times relevant hereto. Lehman engaged E&Y to audit its
21  financial statements, as well as to provide a written report as to whether the internal controls
22  were effective and whether the financial statements were fairly presented. Lehman also engaged
23  E&Y to perform reviews of its quarterly financial results. For its work, E&Y earned tens of
24  millions of dollars in annual fees, including over $31 million in 2007 alone.

25
26
27
28

⊗
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**D.    Doe Defendants**

39.    Except as described herein, Plaintiff is ignorant of the true names of Defendants sued as Does 1 through 20 inclusive and, therefore, sues these Defendants by such fictitious names. Plaintiff will seek leave of the Court to amend this Complaint to allege their true names and capacities when they are ascertained.

40.    Plaintiff alleges that each of these Doe Defendants is responsible in some manner for the acts and occurrences alleged herein, and that Plaintiff's damages were caused by such Doe Defendants.

**E.    Agents and Co-Actors**

41.    At all relevant times, each Defendant was and is the agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants.

42.    Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions, to induce Plaintiff to purchase and hold the securities that are the subject of this Complaint.

43.    Defendants, and each of them, have participated as members of the fraud or acted with or in furtherance of it, or aided or assisted in carrying out its purposes alleged in this Complaint, and have performed acts and made statements in furtherance of the violations and conspiracy.

**F.    Unnamed Participants**

44.    Numerous individuals and entities participated actively during the course of and in furtherance of the conspiracy and concealed such information from the public. There was a conspiracy and many acts were done in the course of and in furtherance of the conspiracy by statements, conduct, and intent to defraud. The individuals and entities acted in concert by joint ventures and by acting as agents for principals, in order to advance the objectives of the conspiracy. The acts were intended to promote the conspiratorial objectives.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

12

1  **IV.   FACTUAL ALLEGATIONS**

2       **A.   The District And Its Investments**

3            **1.   State Law Authority And Requirements**

4       45.    California Government Code Section 56036 defines: "'[S]pecial district' means

5  an agency of the state, formed pursuant to general law or special act, for the local performance of

6  governmental or proprietary functions within limited boundaries."

7       46.    California Government Code Section 53630.1 states, "The Legislature hereby

8  finds that the solvency and creditworthiness of each individual local agency can impact the

9  solvency and creditworthiness of the state and other local agencies within the state and all of its

10 political subdivisions, the Legislature hereby declares that the deposit and investment of public

11 funds by local officials and local agencies is an issue of state wide concern."

12      47.    Based on this policy, the California Legislature enacted several statutes governing

13 the investment of a local agency's surplus public funds, including the types and amounts of such

14 investments. Cal. Govt. Code § 53600, et seq.

15      48.    Pursuant to state law, the primary objectives in managing public funds, in order of

16 priority, are to 1) safety; 2) liquidity; and 3) rate of return. Cal. Govt. Code §53600.5.

17 Consistent with these objectives, state law places strict limitations on the instruments in which

18 local agencies may invest, as well as the concentration of such investments. For example,

19 treasury investments are limited, by statute, to conservative instruments such as U.S. Treasury

20 obligations, highly-rated commercial paper, certificates of deposit, and the like.

21      49.    State law also places restrictions upon an agency's concentration of investments.

22 Such restrictions depend on the instruments at issue, as well as the type of local entity making the

23 purchase. For example, Government Code Section 53601, which applies specifically to local

24 agencies, authorizes a district to invest up to 10% of fund proceeds into the commercial paper of

25 a single issuer so long as the issuer has a rating of A-1/P-1/F-1. Section 53601 also allows up to

26 30% of an agency's funds to be invested in "medium term notes," but only 20% of an agency's

27 funds to be invested in money market mutual funds.

28

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

13

## 2.    The Structure And Investment Policy Of The District

50.    The District has invested its funds for many years. As a special district, the District relies heavily on user fees to fund the costs of operation, maintenance, capital improvements, and recurring capital replacement. The funds are used to finance services provided by the district including capital projects and meet liquidity and cash flow needs.

51.    The Districts's investments are governed by the District's Investment Policy, which was developed and adopted pursuant to Government Code Section 53600 et seq. The Investment Policy sets the investing objectives, authorized investments, the maturity and average life of investments, and controls relating to investment authority and reporting.

52.    In accordance with California law, District employees prepare and submit written statements of investment policy to the Board for review and approval.

53.    Pursuant to the District's Investment Policy, the responsibility for making investments resides with the District's Investment Committee, which makes investment decisions on behalf of the District within the guidelines of the policy and state law.

54.    In accordance with California statutes, the District annually issues a report on its financial position and results of operations, and this report is audited by independent certified public accountants.

55.    The investment objectives of the District's Investment Policy are consistent with state law and can be summarized, in order of priority, as: (1) safety, (2) liquidity and (3) return on investments.

56.    As a result of these statutory mandates, the District has a long history of maintaining high quality investment portfolios governed by a disciplined investment strategy passive management techniques, "buy and hold," and conservatively designed to achieve a reasonable balance of risk and a stable source of earnings.

57.     Unfortunately, in reliance on Defendants' misrepresentations and omissions, described in more detail below, the District made an investment with Lehman totaling approximately $10 million. Specifically, on February 5, 2008, the District purchased Lehman's 5.25% Notes maturing on February 6, 2012, Cusip No. 52517PR60, with a par value of $10 million and a purchase price of $10,253,524.06.

**B.     The Development of The Mortgage Securitization Industry**

**1.     Increasing Use of Sub-Prime Loans**

58.     Between 1995 and 2005, there was a dramatic rise in home ownership in the United States.

59.     One of the most important factors for the increase in home ownership was innovation in the mortgage finance industry, as more and more individuals sought home loans. However, unbeknownst to investors, loan originators such as Lehman began to compete for potential borrowers by lowering underwriting standards and offering new loan products geared towards borrowers with weaker credit.

60.     For example, loan originators reduced minimum qualifying credit scores, allowed borrowers to finance a greater percentage of the property value or carry a higher debt load such as "no money down loans." Many of these riskier mortgages are generally referred to as "subprime loans." "Subprime" describes borrowers who do not qualify for prime interest rates because they have weaker credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies, low credit scores, high debt-burden ratios, or high loan-to-value ratios.

61.     The subprime mortgage market grew from $40 billion in 1994 to $600 billion in 2005, amounting to approximately 20% of the total residential loans originated in 2005. There was a dramatic growth in "Alt-A" loans, where there is reduced or no documentation required to secure a mortgage. According to a report by Standard & Poor's ("S&P"), Alt-A originations increased from less than $20 billion in 2000 to more than $300 billion in 2005.

1  62.     Subprime and Alt-A mortgage originators offered products with greater risk of
2  nonpayment, such as interest-only mortgages that allowed borrowers to pay only interest for a
3  period of time, negative amortization loans, which allowed borrowers to make a minimum
4  payment that was less than the monthly accrued interest on the mortgage, thus increasing the
5  principal amount owed on that loan, and initial fixed-rate mortgages (often at relatively low
6  "teaser" rates) that later converted to adjustable market rates, otherwise known as adjustable rate
7  mortgages or "ARMs."

8  63.     The growth of the commercial mortgage market followed a course similar to the
9  residential market. A robust secondary market grew for commercial mortgages, and lending
10  standards for commercial loans declined. For example, in April 2007, Moody's described its
11  concern over the "continued slide" in commercial lending standards. Moody's observed that,
12  like residential lenders, commercial lenders were requiring less documentation. Further,
13  commercial mortgages originated in the first quarter of 2007 exceeded the estimated value of the
14  underlying properties by 11%. Moody's also noted that the vast majority of mortgages allowed
15  for interest-only payments and many included secondary financing. Moody's also highlighted
16  that property values had reached "unprecedented highs."

17  **2.     The Practice Of Pooling Risky Mortgages As A Security**

18  64.     Typically, to protect itself from risk that a borrower would default on the loan, the
19  originator held a lien on the property as collateral for the loan. By 1990, however, a new model
20  emerged, as secondary market participants began purchasing mortgages from the loan originators
21  soon after the mortgages were issued.

22  65.     Wall Street firms were among the largest purchasers of mortgages on the
23  secondary market. In a process known as securitization, the firms pooled mortgages into
24  Mortgage Backed Securities ("MBS"), including both Residential Mortgage Backed Securities
25  ("RMBS") and Commercial Mortgage Backed Securities ("CMBS"), and sold interests in the
26  underlying cash flow from the mortgages to investors, who received a right to future payments as
27  borrowers made principal and interest payments. Wall Street firms collected large fees for

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

16

1 structuring, underwriting, and servicing the MBSs. These large fees fueled the demand for loans
2 to securitize, which led to even more competition among lenders for borrowers and, to increase
3 the pool of borrowers, contributed to a marked decline in lending standards. On the plus side, the
4 securities offered rich and institutional investors a steady rate of return. That was true, of course,
5 only if the mortgages were solid.

6     66.    The securities were dependent on interest rates. For example, rising interest rates
7 negatively affect borrowers whose underlying loans are ARMs, meaning that the interest rate
8 paid by the borrower changes along with the prevailing market interest rates. For example, if an
9 RMBS is backed by a pool of non-prime ARMs, a rise in interest rates increases the borrower's
10 monthly payments, increasing the likelihood that some borrowers will default on their mortgages,
11 thereby decreasing the value of the security. Rising interest rates also have a negative effect on
12 borrowers in fixed-rate mortgages. While housing prices were rising, many people borrowed
13 more than they could afford, believing that they could take advantage of the price appreciation
14 and refinance into mortgages with better terms once their equity interest increased. Increasing
15 interest rates make such re-financing less attractive.

16     67.    A slowdown in housing price appreciation or a decline in housing prices also
17 lowers the value of RMBSs. Counting on housing price appreciation, many borrowers believed
18 that they could simply refinance into better terms or sell the property for a profit. Instead, when
19 prices failed to rise, these borrowers became encumbered with mortgages they could not afford.
20 Similar problems extended to commercial mortgages, as lenders provided mortgages for close to
21 the entire value of a property. Further, commercial lenders originated mortgages with monthly
22 payments greater than the projected monthly income on the properties.

23     68.    Declining prices also created incentives for certain borrowers to abandon their
24 mortgages. If prices decline such that the value of a home is less than the outstanding amount on
25 the mortgage (especially likely in those situations where lenders provided mortgages for amounts
26 close to the total value of the home), a borrower who cannot afford the mortgage payments has
27 an incentive to simply walk away from the "upside down" mortgage.

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

17

1    69.    Lehman served as the key player in linking non-prime mortgage originators
2 with the ultimate MBS investors. To obtain a ready supply of loans to pool and securitize,
3 Lehman entered into purchase agreements and extended warehouse lines of credit to loan
4 originators. In the purchase agreements, investment banks agreed to purchase a certain amount
5 of mortgages from a loan originator. Through warehouse lines of credit, investment banks
6 extended credit to loan originators to fund a cycle of mortgage lending. In return for the line of
7 credit, the originator typically agreed to grant the investment bank the right to either buy the
8 mortgages or sell securities on a certain portion of the mortgages pool.

9    **C.    Lehman Emerges As The Industry Leader In Mortgage-Backed Securities**

10    70.    Beginning in the late 1990s, and increasing dramatically just prior to 2004,
11 Lehman participated directly in all aspects of the residential and commercial mortgage markets,
12 and its mortgage-related businesses comprised the Company's single largest revenue component.
13 This participation included originating mortgages, purchasing mortgages, packaging mortgages
14 into securities, and marketing the securities to investors. The Company promoted itself as "a
15 market leader in securitization transactions, including securitizations on residential and
16 commercial loans and "the origination, structuring and underwriting of asset-backed securities."
17 Lehman also claimed that its vertically-integrated mortgage business minimized risks associated
18 with holding mortgage-related assets on its balance sheet, which differentiated itself from others
19 who were not vertically integrated and which held non-prime loans on their balance sheet along
20 with the risk exposure until they accumulated a large enough loan pool to securitize.

21    71.    As Defendant Callan explained during one investor conference, Lehman "didn't
22 look at participating in the residential mortgage market as taking a directional bet one way or the
23 other." Instead, Lehman sought only to hold mortgage assets on its books long enough so that
24 they could be securitized and sold to investors. As Callan described: "[w]e looked at it as a
25 business where we could take a spread out of this originating to distribute. If you have that mind
26 set, your inclination then is to hedge whatever inventory you get long, until the time frame to

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

18

1   which you can distribute the inventory through a securitization or otherwise. That was our

2   model." Defendant Callan explained:

3       It doesn't come from Goldman's model of taking a proprietary bet, or Morgan
        Stanley's model, or even Merrill's model of warehousing a significant amount of
4       product. It just comes from a basic focus and philosophy that we really didn't
        want to go long the product or short the product. We wanted to originate to
5       distribute and we hedged that origination capability.

6       72.     However, the mortgages on Lehman's balance sheet, the assets

7   of which were highly leveraged exposed Lehman,, to massive losses when the mortgage market

8   and the market for mortgage-backed assets declined.

9       73.     Lehman's business model included forming subsidiaries to provide whole loans

10  or "raw product" to the firm's securitizations. According to its 2007 Form 10-K, Lehman

11  originated approximately $60 billion in residential mortgages during 2006 and $47 billion during

12  2007. Twenty-five percent of the loans Lehman originated through its subsidiaries were

13  subprime loans.

14      74.     In the late 1990s, Lehman was underwriting loans issued by questionable lenders.

15  The Company did a lot of the underwriting early on for loans issued by notorious lenders and

16  loan servicers, including Delta Funding Corp., First Alliance Mortgage Company ("FAMCO"),

17  and Aurora Loan Services LLC ("Aurora").

18      75.     The U.S. Justice Department sued Delta Funding in 2000 under the Fair Housing

19  Act for a range of illegal behavior, which included charging unfairly large fees and penalties to

20  homeowners, handing out kickbacks, and charging more to African-American homeowners.

21      76.     In 2000, FAMCO filed for bankruptcy protection in the Central District of

22  California. In August 2001, a class action was filed against FAMCO and Lehman, alleging that

23  Lehman helped FAMCO cheat borrowers. In 2003, a federal jury ruled that Lehman not only

24  knew about the fraud, but actually assisted the company in deceiving homebuyers and awarded

25  damages against FAMCO and Lehman of $51 million. According to Lehman's recent SEC

26  filings, the suit was settled out of court for an undisclosed sum earlier this year.

27

28

❀
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

77.     Lehman purchased an entity now known as Aurora Loan Services LLC ("Aurora"), a residential loan originator and servicer of predominately "Alt-A mortgage products," and moved its headquarters from Nebraska to Colorado.

78.     In its Form10-Q filed on July 15, 2003, Lehman reported that the acquisition of Aurora "adds long-term value to our mortgage franchise by allowing further integration of the business platform. The mortgage loans originated by [Aurora] are expected to provide a source of loan product for our securitization pipeline."

79.     In fact, all of Aurora's production went to Lehman, with Aurora acquiring loans in the name of its subsidiary. Aurora rapidly expanded and eventually held an $80 billion mortgage portfolio, making it one of the largest loan-servicing companies in the country. Aurora was also one of the largest loan originators, meaning that some portion of the bad loans, which led to Lehman's downfall, were issued by its own subsidiary. After Lehman obtained loans through Aurora, Lehman handled all secondary transactions and handled all pricing out of New York. Lehman dictated what loans Aurora was buying and had to approve Aurora's guidelines. Aurora purchased pools of closed loans on behalf of Lehman for securitization deals. Aurora bought mortgages from about 10,000 brokers and originators around the country. Lehman also purchased pools of loans from subprime originators such as Countrywide, New Century, American Home Mortgage and  Washington Mutual.

80.     Lehman also purchased BNC Mortgage LLC ("BNC") in 2000, which gave Lehman a subsidiary that directly lent to homebuyers. Lehman described BNC as its "subprime origination platform." BNC focused on subprime originations until it closed in August 2007. BNC sold roughly 75% of its production to Lehman, and as 2007 progressed and the market for non-prime loans deteriorated, Lehman purchased an even higher percentage of BNC's loans.

81.     As with the residential mortgage market, Lehman became increasingly involved in all aspects of the commercial mortgage market – origination of commercial mortgages, securitization of mortgages, and marketing of securities backed by commercial mortgages. It originated approximately $27 billion in commercial mortgages in 2005 and $34 billion in 2006. In 2007, Lehman increased its origination activity even as the real estate markets deteriorated,

1    originating $60 billion in commercial mortgages.  Lehman's commercial side originated all of its
2    own loans and did not purchase them from other companies.

3          82.      As of March 2008, Lehman had more commercial holdings than any other firm.
4    It had over $10 billion more than its nearest competitor, Citigroup, and more than double the
5    commercial holdings of Morgan Stanley, Bear Stears, and JPMorgan.

6          83.      Including both residential and commercial mortgages, at the Individual
7    Defendants' direction, Lehman vastly increased its exposure to losses in the mortgage market.
8    At the very time the mortgage and housing markets were melting down in 2006  and 2007, and
9    mortgage assets were becoming increasingly illiquid.   The aggregate value of this portfolio grew
10   by 54% in 2007, from $57.7 billion at year-end 2006 to over $89.1 billion by year-end 2007.

11         **D.    As the Mortgage Market Deteriorates, Lehman's Risk Exposure Multiplies**

12         84.      As Lehman's mortgage and mortgage-related assets comprised a greater
13   percentage of Lehman's shareholders equity, the Company faced an increased risk that a smaller
14   percentage decline in the value of these assets would erode its shareholder equity and render the
15   Company insolvent.  For example, because Lehman's mortgage and mortgage-related assets were
16   roughly four times its shareholders equity in the second quarter of 2007, if Lehman wrote down
17   the value of these assets by just 25% during the quarter, the loss would have been equal to its
18   total shareholder equity.

19         85.      By early 2006, the U.S. entered a period marked by a steep decline in home price
20   appreciation and rising mortgage interest rates, which, combined, led to an unparalleled number
21   of mortgage delinquencies and home foreclosures.  The crisis spread to the commercial real
22   estate market.  The collapsing real estate markets materially affected the market value of the
23   billions of dollars of mortgages and MBSs on Lehman's balance sheet.

24         86.      Home price indices noted that home prices had peaked in mid-2004 and then
25   demonstrated a dramatic drop in annual returns.  As U.S. housing prices fell, interest rates
26   increased sharply after 2005, which was particularly damaging for borrowers who had purchased
27   homes with ARMs.  As long as housing prices continued to increase, borrowers could refinance
28   their loans or sell their homes for big gains.  As prices dropped, however, many borrowers who

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  had ARMs found it impossible to afford the increasing payment when rates adjusted upward in
2  2006 and 2007, and were unable to refinance the loans because the outstanding mortgage debt
3  exceeded the value of the home, leading to an unprecedented number of mortgage defaults and
4  home foreclosures.

5       87.    Similarly, foreclosure databases reported dramatic increases in foreclosure filings.
6  The rapid increase in mortgage defaults and home foreclosures between 2005 and 2007, at
7  precisely the time when Lehman had expanded its mortgage-related business and had amassed a
8  portfolio of nearly $90 billion in mortgage-backed assets, including significant exposure to assets
9  backed by Alt-A and subprime loans, compromised the value and diminished the marketability of
10  these assets on Lehman's balance sheet.

11       88.    Defendants, including E&Y, were well aware of these market conditions
12  generally, and Lehman's growing exposure, specifically. In a November 10, 2008 article,
13  Bloomberg reported that in November 2004, more than two years before the bull market reached
14  its peak, Defendant Fuld – known as the "Gorilla" at Lehman – told people around him that low
15  interest rates and cheap credit would create a bubble that could one day pop: "It's paving the road
16  with cheap tar. When the weather changes, the potholes that were there will be deeper and
17  uglier." Later, in January 2006, several banks, including Lehman, collaborated with Markit
18  Group Limited to create the ABX indices ("ABX") to track the performance of various RMBS
19  tranches. Markit Group Limited also created CMBX indices ("CMBX"), which provide
20  value and pricing information on the CMBS market.

21       89.    However, during the first half of 2007, the ABX plummeted, indicating that the
22  cost of insuring subprime RMBSs had increased dramatically. The ABX indicated that the value
23  of RMBSs backed by subprime mortgages was deteriorating at a near-historic pace throughout
24  2007. In addition, in the first half of 2007, given the rise in delinquencies and defaults, the rating
25  agencies – such as Fitch, S&P, and Moody's – downgraded MBSs, reflecting the reduced value
26  of the tranches. For example, in the first quarter of 2007, Moody's stated that "loans securitized
27  in the first, second and third quarters of 2006 have experienced increasingly higher rates of early
28  default than loans securitized in previous quarters." Moreover, in June, Moody's noted that,

1  "within the 2006 vintage . . . the performance of late-2006 pools is generally worse than that of
2  early-2006 pools." Further, "following the pattern of serious delinquencies . . . cumulative losses
3  for late 2006 pools have trended higher than those for early 2006 pool at the same points of
4  seasoning."

5      90.   Following the deterioration in RMBSs, CMBSs also began to decline in value in
6  2007. As early as April 2007, Moody's indicated that it would require more protection for
7  investors in CMBSs because of a "continued slide" in lending standards. Similar to residential
8  mortgages, commercial mortgage delinquencies steadily increased throughout 2007. According
9  to the Federal Reserve Board, the overall delinquency rate was 1.1% in the second quarter of
10  2007, but rose to 1.94% in the fourth quarter, the highest level since 2001.

11      91.   Beginning in mid-2007, indices tracking CMBS tranches indicated an increasing
12  risk of default in all the tranches. As noted above, in contrast to the ABX, an increase in the
13  CMBX indicates that the market expects rising defaults. CMBX spreads widened beginning in
14  mid-2007, even for the highest rated tranches, indicating that the market expected large increases
15  in defaults and losses on CMBSs.

16      92.   On May 3, 2007, UBS announced that it was closing an in-house hedge fund after
17  suffering huge losses investing in the U.S. mortgage securities industry. The fund, Dillon Read
18  Capital Management, had been in existence for less than two years. A short time later, Bear
19  Stearns contacted investors in two of its hedge funds that invested in subprime debt instruments,
20  informing them that "preliminary estimates show there is effectively no value left for the
21  investors in the Enhanced Leverage fund and very little value left for the investors in the High-
22  Grade Fund." Bear Stearns warned that bonds that had high credit ratings were experiencing
23  "unprecedented declines" in value.

24      93.   In response, analysts speculated that Bear Stearns announcement should trigger
25  mass revaluation of portfolios with similar subprime debt instruments held by Wall Street banks,
26  such as Lehman, which had even greater exposure to subprime mortgages. On July 18, 2007, in
27  response to the rumors, Lehman spokesperson Kerrie Cohen reportedly stated: "[t]he rumors
28  regarding [Lehman's] subprime exposure are totally unfounded."

❸
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

94.     Even after Bear Stearns provided a $3.2 billion infusion for one of the hedge funds, both funds filed for bankruptcy protection. On Tuesday, August 14, 2007, Lehman's shares fell sharply on news that the two hedge funds were collapsing. According to the *Dow Jones News Service*:

> Lehman and Bear Stearns tend to be twinned in investors' minds, because they are smaller and less diversified than Wall Street giants Goldman Sachs Group (GS), Merrill Lynch & Co. (MER) and Morgan Stanley (MS). Yet Lehman is seen as taking more risk than Bear Stearns. And in the current environment, Lehman may be paying a price for its relative silence about its exposure to trouble mortgages and high-risk debt.

95.     Defendants were well aware of data on the performance of MBSs issued and sold by Lehman from 2005 to 2007, and knew that loans in Lehman's securitization pools experienced increased deficiencies and defaults. Lehman collected, aggregated, and tracked the performance of its mortgage pools in order to comply with SEC regulations.

96.     The data illustrated that loans originated in 2005, 2006 and 2007 experienced markedly higher rates of delinquency and foreclosure than comparable loans originated in prior years. The performance of loans in Lehman's securitizations also deteriorated, as Lehman was forced to "replace" loans in some securities. Indeed, between March and April of 2006, Lehman put funds back into two securitization entities, SASCO and LXS, because mortgages in these entities were not performing.

97.     In late 2006, many of the loans Aurora acquired went into default immediately upon acquisition. Given the early defaults, Lehman was faced with a large amount of repurchase requirements from its securitizations. Aurora was also having trouble getting originators to repurchase loans on 2006. The defaulted loans sat on the books. Lehman's subprime originator, BNC, was also facing dramatically increasing numbers of repurchase requests from loan purchasers who claimed that certain loans violated BNC's representations and warranties. The repurchase requests increased dramatically and more employees began working on repurchase requests. BNC held weekly meetings to review repurchase requests.

1   98.    As a result of unfulfilled requests, Lehman sued counterparties for failing to
2   repurchase loans. As early as June 22, 2006, Lehman sued Master Financial, Inc. ("MFI"), a loan
3   originator based in California, for failing to repurchase loans that it had sold Lehman. According
4   to the Company's complaint, Lehman "is informed and believes and based thereon alleges that
5   MFI failed to follow the contractually required 'legal, proper, prudent and customary practices'"
6   in originating the loans at issue. Lehman further claimed that "the misrepresentations and other
7   irregularities, including payment defaults [on the loans] . . . lowered their value considerably as
8   investment loans. Because MFI failed and refused to repurchase the irregular, non-conforming
9   and poorly-performing loans when demand was made, [Lehman] was then obligated to liquidate
10  them by foreclosure or resale at considerable discount due to their reduced value, resulting in
11  significant losses." Lehman sued other lenders during this time period. For example, in August
12  2007, Lehman sued Fieldstone Mortgage Company for failing to repurchase delinquent loans.

13  99.    The repurchase requests demonstrate the rapidly deteriorating value of Lehman's
14  mortgage and mortgage-related assets held on its balance sheet. Moreover, Lehman's and it
15  subsidiaries' inability to successfully pursue repurchase requests resulted in a dramatic increase
16  on Lehman's exposure to high risk, and in some cases, non-performing, mortgage assets during
17  this time period.

18  100.    Despite the rise in repurchase requests and the inability of Lehman's subsidiaries
19  to collect on their repurchase requests, Aurora did not cease doing business with many of its
20  correspondent lenders, as it needed to fulfill Lehman's securitization needs. Aurora continued to
21  buy low quality loans despite the increasing problems in the industry. Aurora continued to buy
22  loans from certain lenders even though they had large numbers of outstanding unpaid repurchase
23  claims. Aurora's "loss management" unit dealt with the various counterparties with
24  respect to repurchases. Repurchase requests increased in 2007 with hundreds of millions of
25  dollars worth of non-performing loans remaining with Aurora.

26  101.    Given the rapidly declining performance of non-prime mortgages, in early 2007,
27  Lehman began making margin calls on originators due to the decreased value of underlying
28  mortgage assets used in connection with such credit lines. For example, in March 2007, Lehman

1   made the first in a series of margin calls on its warehouse line of credit to Alt-A mortgage lender

2   American Home Mortgage ("AHM"), claiming that the value of AHM's notes had dropped

3   significantly. Following three months of mortgage calls by Lehman, and after Lehman had

4   declared AHM in default of its payment obligations, AHM declared bankruptcy in August 2007.

5        102.   Further, Lehman issued numerous margin calls to Accredited, another mortgage

6   lender on the Company's credit facilities, in early 2007. Again, these margin calls resulted from a

7   decline in the value of the collateral used to secure those facilities – the lender's mortgages.

8        103.   On July 5, 2007, Lehman cut off a $1.5 billion credit line to Option One

9   Mortgage Corporation, a subsidiary of H&R Block, Inc.

10       104.   In the Spring 2007, Lehman held a major conference for employees in Phoenix,

11   Arizona and reported that the market's appetite for subprime loans had changed, and, as result,

12   Lehman needed to tighten up guidelines.

13       105.   Given the increasing problems in the mortgage market in 2006 and 2007,

14   origination and securitization businesses declined substantially. Lehman experienced the decline

15   directly, with both its origination and securitization business slowing severely.

16       106.   As the securitization market slowed, Lehman was forced to account for many of

17   the securitization deals as secured financings instead of sales. Securitizers, such as Lehman,

18   prefer to account for deals as sales rather than secured financings, since secured financings do not

19   allow for the removal of securitized assets from the balance sheet. For financial institutions, the

20   removal of non-performing assets from the balance sheet is one of the primary benefits of

21   engaging in the sale of securitized assets.

22       107.   Lehman stated in its SEC filings that it "is a market leader in securitized

23   transactions, including securitizations of residential and commercial loans." Further, Lehman

24   indicated that the vast majority of its securitization transactions were designed to be booked as

25   sales, not as secured financings, which would have to remain on Lehman's balance sheet.

26   However, Lehman was having trouble qualifying its securitizations as sales. Even with prime

27   deals, Lehman was having trouble selling the lower-rated tranches. If Lehman could not sell the

28

❸
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  required percentage of a securitization deal, then it would remain on Lehman's balance sheet.

2  Securitizations slowed by the Summer of 2007.

3  108.  Additionally, the delinquent and defaulting mortgages assets that accumulated in

4  Lehman's holdings had a negative impact on its liquidity and capital resources. Lehman faced

5  significant liquidity problems due in large part to the decline in value of mortgage-related assets.

6  Lehman purchased many of its assets using secured credit obtained under tri-party repurchase

7  agreements. If the market value of pledged assets declined, secured lenders would impose

8  "haircuts" on Lehman. The reduced availability of secured financing forced Lehman to draw

9  down on its liquidity pool in order to execute transactions.

10  109.  In August 2007, Lehman announced that it was shutting down BNC. According

11  to a Lehman press release announcing the closure, "market conditions have necessitated a

12  substantial reduction in... resources and capacity in the subprime space."

13  110.  Similarly, by January 2008, Lehman closed Aurora's wholesale and

14  correspondent lending divisions. According to Lehman's January 17, 2008, press release:

15      Lehman Brothers announced today that it will substantially reduce its resources and
       capacity in the U.S. residential mortgage origination space in light of the dislocation in
16      the mortgage markets. As a result, the Firm is suspending its Wholesale and
       Correspondent lending activities at its Aurora Loan Services subsidiary. Aurora will
17      continue to originate loans through its direct lending channel, and will maintain its
       servicing business.

18  **E.  Lehman's SEC Filings And Related Market Reports, Reviewed And Audited
       by E&Y, Failed To Disclose Lehman's Increasing Exposure To Mortgage-
19      Related Losses**

20  111.  As Defendants were receiving internal reports detailing the deterioration of

21  Lehman's real estate portfolio, Lehman's SEC filings, related market reports, and E&Y's audit

22  reports during this period continued to downplay any increased risk exposure from Lehman's

23  nearly $80 billion in mortgage-related holdings. To the contrary, Defendants repeatedly

24  reaffirmed that Lehman's financial statements properly reflected the Company's financial

25  condition and that its internal control structure was sound and reliable.

26

27

28

112.     Pursuant to Sections 302 and 404 of the Sarbanes-Oxley Act of 2002 ("SOX"), Lehman's management was required to and did certify to Lehman's stakeholders that the financial statements were truthful and reliable, and that management had taken appropriate steps to satisfy themselves that the disclosure processes and controls at Lehman were capable of consistently producing financial information that stakeholders could rely upon. Similarly, for fiscal years 2005 and 2006, Lehman's external auditor – E&Y – was required to and did attest to and report on the reliability of management's assessment of internal controls pursuant to Section 404 of SOX, in addition to auditing and reporting on Lehman's financial statements and internal controls. All three of these audit opinions were included in the E&Y's reports for fiscal years 2005 and 2006, as described below. For fiscal year 2007, E&Y continued to audit and report on Lehman's financial statements and internal controls.

113.     On February 13, 2006, Lehman filed with the SEC its Annual Report on Form 10-K for the fiscal year ended November 30, 2005 ("2005 10-K"). The 2005 10-K was signed by, amongst others, Defendants Fuld, O'Meara, Akers, Berlind, Evans, Hernandez and Kaufman. The 10-K disclosed that the Company had securitized approximately $133 billion of residential mortgage loans during the fiscal year. In the 2005 10-K, the Company reported a second consecutive year of record net revenue in the amount of $14.6 billion, an increase of 26% over fiscal year 2004. In addition, the Company reported revenues from Principal Transactions of $7.8 billion, net income of $3.3 billion, and diluted earnings per share of $5.43.

114.     The 10-K included two reports by Lehman's auditors, E&Y, addressed and directed both to Lehman's Board and stockholders. In the reports, E&Y issued unqualified audit opinions that (1) management's assessment that Lehman maintained effective internal control over financial reporting is fairly stated, (2) Lehman maintained effective internal control over financial reporting, and (3) the Company's financial statements fairly presented Lehman's financial position in conformity with GAAP. E&Y asserted:

1    We conducted our audit in accordance with the standards of the Public Company
2    Accounting Oversight Board (United States).  Those standards require that we
    plan and perform the audit to obtain reasonable assurance about whether effective
3    internal control over financial reporting was maintained in all material respects.
    Our audit included obtaining an understanding of internal control over financial
4    reporting, evaluating management's assessment, testing and evaluating the design
    and operating effectiveness of internal control, and performing such other
5    procedures as we considered necessary in the circumstances.  We believe that our
    audit provides a reasonable basis for our opinion.

6                           * * *

7    In our opinion, management's assessment that Lehman Brothers Holdings Inc.
    maintained effective internal control over financial reporting as of November 30,
8    2005, is fairly stated, in all material respects, based on the COSO criteria.  Also,
    in our opinion, Lehman Brothers Holdings Inc. maintained, in all material
9    respects, effective internal control over financial reporting as of November 30,
    2005, based on the COSO criteria.

10

                          * * *
11

   In our opinion, the financial statements referred to above present fairly, in all
12    material respects, the consolidated financial position of Lehman Brothers
    Holdings Inc. at November 30, 2005 and 2004, and the consolidated results of its
13    operations and its cash flows for each of the three years in the period ended
    November 30, 2005, in conformity with U.S. generally accepted accounting
14    principles.  Also, in our opinion, the related financial statement schedule, when
    considered in relation to the basic financial statements taken as a whole, presents
15    fairly in all material respects the information set forth therein.

16    We also have audited in accordance with the standards of the Public Company
    Accounting Oversight Board (United States), the effectiveness of Lehman
17    Brothers Holdings Inc.'s internal control over financial reporting as of November
    30, 2005, based on criteria established in Internal Control-Integrated Framework
18    issued by the Committee of Sponsoring Organizations of the Treadway
    Commission and our report dated February 13, 2006 expressed an unqualified
19    opinion thereon.

20       115.     Similarly, on February 13, 2007, Lehman filed with the SEC its Annual Report on

21   Form 10-K for the fiscal year ended November 30, 2006 ("2006 10-K").  The 2006 10-K was

22   signed by, amongst others, Defendants Fuld, O'Meara, Akers, Berlind, Evans, Hernandez and

23   Kaufman, and disclosed the company had securitized approximately $146 billion of residential

24   mortgage loans during the fiscal year.  The Company reported a third consecutive year of record

25   net revenue in the amount of $17.6 billion, an increase of 20% over fiscal year 2005.  In addition,

26   the Company reported  revenues from Principal Transactions of $9.8 billion, net income of $4

27   billion, and diluted earnings per share of $6.81.

28

116.    As before, the 10-K included two reports by Lehman's auditors, E&Y, addressed

and directed both to Lehman's Board and stockholders. In the reports, E&Y issued unqualified

audit opinions that (1) management's assessment that Lehman maintained effective internal

control over financial reporting is fairly stated, (2) Lehman maintained effective internal control

over financial reporting, and (3) the Company's financial statements fairly presented Lehman's

financial position in conformity with GAAP. E&Y asserted:

> We conducted our audit in accordance with the standards of the Public Company
> Accounting Oversight Board (United States). Those standards require that we
> plan and perform the audit to obtain reasonable assurance about whether effective
> internal control over financial reporting was maintained in all material respects.
> Our audit included obtaining an understanding of internal control over financial
> reporting, evaluating management's assessment, testing and evaluating the design
> and operating effectiveness of internal control, and performing such other
> procedures as we considered necessary in the circumstances. We believe that our
> audit provides a reasonable basis for our opinion.

> * * *

> In our opinion, management's assessment that the Company maintained effective
> internal control over financial reporting as of November 30, 2006, is fairly stated,
> in all material respects, based on the COSO criteria. Also, in our opinion, the
> Company maintained, in all material respects, effective internal control over
> financial reporting as of November 30, 2006, based on the COSO criteria.

> * * *

> In our opinion, the financial statements referred to above present fairly, in all
> material respects, the consolidated financial position of Lehman Brothers
> Holdings Inc. At November 30, 2006 and 2005, and the consolidated results of its
> operations and its cash flows for each of the three years in the period ended
> November 30, 2006, in conformity with U.S. generally accepted accounting
> principles. Also, in our opinion, the related financial statement schedule, when
> considered in relation to the basic financial statements taken as a whole, presents
> fairly in all material respects the information set forth therein.

> We also have audited in accordance with the standards of the Public Company
> Accounting Oversight Board (United States), the effectiveness of Lehman
> Brothers Holdings Inc.'s internal control over financial reporting as of November
> 30, 2006, based on criteria established in Internal Control-Integrated Framework
> issued by the Committee of Sponsoring Organizations of the Treadway
> Commission and our report dated February 13, 2007 expressed an unqualified
> opinion thereon.

117.    A few weeks later, on March 14, 2007, Lehman announced its financial results for

the first quarter of fiscal 2007, reporting purported "record net revenues in the Capital Markets

and Investment Managements segments." According to Defendant Fuld, these "results clearly


LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  demonstrate that we are better positioned than ever to create value for [our] clients and [our]
2  shareholders."  In a conference call held that same day, Defendant O'Meara stated that Lehman
3  was "well positioned to benefit from this evolving situation given our experience in this sector as
4  well as our ample liquidity and risk management practices" and that Lehman expected "to see
5  various opportunities as a result of the market dislocations."  O'Meara further said that Lehman
6  saw "the subprime challenges as being a reasonably contained situation" and downplayed
7  Lehman's subprime exposure, stating that it accounted for less than 3% of its firm-wide revenues
8  over the past six quarters. O'Meara also downplayed any significant impact of subprime
9  delinquencies on the economy as a whole, stating "when you think about the subprime business,
10 itself, it is not something that's going to itself create a big event in the economy" and "this is
11 reasonably well contained at this point."  As to Lehman's exposure, O'Meara stated, "it is subject
12 to the same hedging principles that we talked about earlier, and it's been working quite
13 effectively."  Finally, O'Meara assured investors that Lehman's balance sheet was well-
14 protected, stating that it "actively hedged the interest rate and credit components of [our]
15 inventory positions including [its] non-investment grade retained interest in securitizations,"
16 "[t]he majority of which are prime mortgage related."

17      118.    As fiscal 2007 went on, Defendants continued to conceal Lehman's true
18 exposure to losses from the collapsing real estate market. During the third quarter, the mortgage
19 and MBS markets continued to deteriorate. Merrill Lynch announced a $7.9 billion writedown,
20 leaving it with a $20.9 billion portfolio of residential subprime mortgages and collaterized debt
21 obligations ("CDOs") at the end of the quarter. Citigroup disclosed "credit and trading losses of
22 $5.9 billion on loans and mortgage-backed securities," and UBS wrote down roughly $3.7 billion
23 on its mortgage-backed securities, which totaled approximately $15.3 billion at the end of the
24 quarter. Lehman, however, refused to reveal details about its holdings, which totaled $88 billion
25 at the end of the quarter. For example, while Lehman disclosed on September 18, 2007, that it
26 took a net of $700 million writedown of assets, it did not say how much was attributed to its
27 mortgage-related assets. When asked to reveal the amount of gross writedowns by analysts,

28

❸
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

31

1   O'Meara replied that "knowing the gross numbers particularly in that business, I don't think is

2   really a meaningful thing."

3        119.    On November 14, 2007, Defendant Lowitt gave a presentation at the Merrill

4   Lynch Banking and Financial Services Investor Conference.  Stating that "[w]e've had success

5   in our hedging and so we don't believe that there will be any requirement for substantial

6   markdowns and certainly no requirement for us to announce anything. We're very comfortable

7   with where we are with regard to that." A few days later, on November 15, 2007, Punk Ziegel &

8   Company, issued a report and discussed Lehman's presentation, stating that:

9        Unlike numbers of its competitors, Lehman suggested that there will not be
         meaningful mark down. In fact, the company suggested that it was short many of
10       the offending securities. This would mean that Lehman could make money where
         others are losing.

11                                              ***

12       However Lehman went beyond these assertions suggesting that it had no major
         losses in the impacted areas for the industry. The company argued that it business
13       is benefiting from the problems surfacing elsewhere. In essence, as customers
         move their accounts away from impacted firms, Lehman along with Goldman
14       Sachs (GS/$233.31/Market Perform) is getting the business.

15       120.    Again, on December 13, 2007, when Lehman released its 2007 fourth quarter and

16  year-end financial results, Defendants continued to withhold information about Lehman's gross

17  writedowns.  For example, during an investor conference call that day, while O'Meara

18  acknowledged that Lehman wrote down its residential and commercial mortgage portfolio by

19  $1.5 billion, he refused to disclose information regarding Lehman's commercial mortgage-related

20  portfolio, stating "we're not giving that."

21       121.    On January 10, 2008, Deutsche Bank Global Markets Research analyst Mike

22  Mayo maintained Deutsche Bank's "Buy" rating for Lehman's stock and issued a report stating:

23  "Our sense is that Lehman is in position for market share gains given a more consistent culture,

24  greater stability with risk management, and benefits from investment spending, especially non-

25  U.S. (Now half of the firm)." Mayo reportedly based his recommendation on information from

26  his meeting with Defendant Callan, stating:

27

28
❂
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

32

1    Most importantly for the long-term, Lehman has a stable culture. As opposed to
     several of its peers, Lehman needed no capital injection or dramatic downsizing
2    (head count should remain flattish this year). The culture showed that risk
     management is effective, with business managers seeming more integrated than its
3    peers.

4                                            ***

     Lehman's culture of risk management starts with the CEO.... The bottom line is
5    that the CEO seems involved in ensuring that potential upside justifies major risks
     that are taken.
6
     122.    On January 29, 2008 – just one week before the District's Lehman investment –
7
     Lehman filed its Annual Report on Form 10-K with the SEC for the fiscal year ended November
8
     30, 2007 ("2007 10-K"). The 2007 10-K included two reports by Lehman's auditors, E&Y,
9
     addressed and directed both to Lehman's Board and stockholders. In the reports, E&Y issued
10
     unqualified audit opinions that (1) Lehman maintained effective internal control over financial
11
     reporting and (2) the Company's financial statements fairly presented Lehman's financial
12
     position in conformity with GAAP. E&Y asserted:
13
             We conducted our audit in accordance with the standards of the Public Company
14           Accounting Oversight Board (United States). Those standards require that we
             plan and perform the audit to obtain reasonable assurance about whether effective
15           internal control over financial reporting was maintained in all material respects.
             Our audit included obtaining an understanding of internal control over financial
16           reporting, assessing the risk that a material weakness exists, testing and evaluating
             the design and operating effectiveness of internal control based on the assessed
17           risk, and performing such other procedures as we considered necessary in the
             circumstances. We believe that our audit provides a reasonable basis for our
18           opinion.

19                                           * * *

20           In our opinion, the Company maintained, in all material respects, effective
             internal control over financial reporting as of November 30, 2007, based on the
21           COSO criteria.

22                                           * * *

23           In our opinion, the financial statements referred to above present fairly, in all
             material respects, the consolidated financial position of Lehman Brothers
24           Holdings Inc. At November 30, 2007 and 2006, and the consolidated results of its
             operations and its cash flows for each of the three years in the period ended
25           November 30, 2007, in conformity with U.S. generally accepted accounting
             principles. Also, in our opinion, the related financial statement schedule, when
26           considered in relation to the basic financial statements taken as a whole, presents
             fairly in all material respects the information set forth therein.
27
             We also have audited, in accordance with the standards of the Public Company
28           Accounting Oversight Board (United States), the effectiveness of Lehman


LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1    Brothers Holdings Inc.'s internal control over financial reporting as of November
     30, 2007, based on criteria established in Internal Control-Integrated Framework
2    issued by the Committee of Sponsoring Organizations of the Treadway
     Commission and our report dated January 28, 2008 expressed an unqualified
3    opinion thereon.

4    Once again, Defendants failed to reveal Lehman's mortgage-related holdings, including the

5    extent and quality of its Alt-A holdings, or that its economic hedges could themselves result in

6    additional loses when the assets also declined in value. To the contrary, despite Lehman's

7    extensive exposure, Lehman only took a total net writedown of $1.5 billion on its mortgage and

8    asset-backed holdings in the fourth quarter while its mortgage related assets exceeded $70

9    billion.

10       123.    Lehman's 2007 Form 10-K also highlighted the Company's "comprehensive risk

11   management structure" with several risk control processes in place to document "risk capacity

12   and tolerance levels" and to monitor and enforce adherence to risk control policies. However,

13   Lehman and the Defendants failed to disclose the true risk of loss associated with Lehman's

14   mortgage-related positions.

15       124.    Indeed, according to a November 10, 2008 *Bloomberg.com* report, Lehman

16   had terminated or demoted risk managers after they raised concerns about Fuld or about

17   Lehman's mortgage-related holdings. For example, as reported, Michael McKeever, who ran

18   investment banking, was stripped of his duties and left in 2000. John Cecil, Chief Financial

19   Officer until 2000, was demoted to an advisor because he opposed Fuld. Michael Gelband, head

20   of Lehman's Fixed Income Division, and Madelyn Antoncic, Lehman's Chief Risk Officer – two

21   of Lehman's best risk managers – were forced out or demoted after asking for hedges on

22   Lehman's investments.

23       125.    However, none of this was public. Indeed, on the same day the Form 10-K was

24   filed, January 29, 2008, Deutsche Bank Global Markets Research analyst Mike Mayo issued a

25   research note maintaining his "Buy" rating for the stock and stating, "[n]et net, Lehman has done

26   a good job managing its risks to date. While we believe more writedowns in leveraged loans and

27   commercial mortgages are likely, we have confidence in management's ability to monitor these

28   risks and take appropriate actions to mitigate potential losses."

❸
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

34

1    126.    On the news, Lehman common stock rose over the next two days and closed at

2  $64.05 on January 31, 2008, for a total gain of $3.16 per share or 5.19%

3    127.    On February 6, 2008, Defendant Callan participated in a Credit Suisse Financial

4  Services Forum and boasted of the Company's discipline in risk management in the second half

5  of 2007, including the active hedging of the residential mortgage book, which [we] started in

6  fiscal 2006." Credit Suisse analyst Susan Roth Katzke published a report that "[ m]anagement's

7  comments ought to increase confidence that such outperformance can continue and stated that

8  Lehman "differentiated itself" in terms of risk management expertise in 2007. With respect to the

9  Company's mortgage portfolio, Katzke also noted that "[w]hile there's clearly risk of near term

10  mark-downs, management is more confident that this portfolio will prove money good over the

11  long term." Katzke then reiterated her Outperform rating for the Company. The price of Lehman

12  common stock increased $2.30 or 3.95% from its closing price of $58.18 on February 6, 2008 to

13  close at $60.48 per share on February 7, 2008.

14    128.    During a conference all that same day, Defendant Callan further discussed mark-

15  to-market adjustments the Company recorded during the quarter, stating:

16    We look at the mark to market adjustments as more temporary in nature, as they
     reflect mark to market accounting related to the pricing of similar transactions in a
17    liquidity constrained environment that we're living in and driven by many
     technical factors, which may not reflect intrinsic value.
18    And I'd really like to contrast that with write-off, which are more permanent in
     nature and refer to impairment. So I know there's been a lot of dialogue in recent
19    weeks about the whole mark to market accounting mechanism, but I just wanted
     to highlight that this is under the mark to market accounting framework and not
20    necessarily reflective of permanent impairment of the assets.

21    The gross revenue reduction, gross numbers for the quarter, from mark to market,
     prehedges, was approximately $4.7 billion.
22
     After hedges, we had a net impact of 1.8 billion, which I think is a pretty good
23    testament to our hedging and risk mitigation capabilities that are core to our
     franchise.
24
     So let me speak a moment about the composition of the net 1.8 write-down.
25    Residential mortgage related positions accounted for 800 million, net. The 800
     million net relates to 3 billion gross. So I think it's fair to say we continue to do a
26    very, very good job managing the risk on residential mortgages, an area that I
     think we're credited with a lot of expertise, a great franchise.
27

28

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1 On the news, Lehman common stock rose $14.74 per share or 46.43% from its closing price of

2 $31.75 on March 17, 2008, to close on March 18, 2008, at $46.49, on heavy volume of 143

3 million shares traded.

4       129.   On March 31, 2008, Lehman announced the issuance of 3,000,000 shares of

5 Preferred Stock in response to "investor interest" and to "bolster the Firm's capital and increase

6 financial flexibility." On April 1, 2008, Lehman increased the preferred offering by one million

7 shares and Defendant Callan stated that "[t]he significant oversubscription for this deal

8 demonstrates the confidence that investors have in Lehman Brothers. The success of the

9 transaction is also reflective of the strength of the business model, the capital base and liquidity

10 profile of the Firm as we continue to successfully weather challenging environments." The price

11 of Lehman common stock rose 18%, increasing $6.70 to $44.34 per share.

12       130.   On April 8, 2008, Lehman filed its Form 10-Q quarterly report for the 2007

13 quarter ended February 29, 2008. The Company disclosed financial instruments and inventory

14 positions owned of $326.658 billion, of which $84.609 billion related to mortgages and asset-

15 backed positions. At Lehman's Annual Shareholders' Meeting a few days later, Lehman's CEO,

16 Defendant Fuld, reassured investors that "the worst is behind us." It certainly was not.

17       131.   On June 9, 2008, Lehman issued a press release announcing its financial results

18 for the quarter ended May 31, 2008, and reported that Lehman expected a net loss for the quarter

19 of $2.8 billion. During an analyst conference call that same day, Defendant Callan stated:

20       Yes, I think to be fair the discussions at this point are not about our viability or the
      fact that we will be here or the fact that we have sufficient liquidity, I think we put
21       that to bed on a number of different levels through our own actions. Obviously, to
      some extent through the Fed's actions.
22
      So, I don't think there is any question on the part of our any of our counterparties
23       or lenders that they will be repaid by Lehman Brothers. I think there is a good
      debate that's being had about the investment banking sector, its return profile as
24       we move forward in a lower leveraged environment.

25       But we are not having any conversation with counterparties or lenders about
      whether they feel confident extending funds and credit to us.
26

27 In fact, during an October 23, 2008 interview with *The New York Times,* Treasury Secretary

28 Paulson later revealed: "Lehman announced bad earnings around the middle of June, and we

❸
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1 told Fuld that if he didn't have a solution by the time he announced his third-quarter earnings,
2 **there would be a serious problem.** ... We pressed him to get a buyer."

3          132.     On June 16, 2008, Defendant Fuld stated "[o]ur capital and liquidity positions
4 have never been stronger" and "So we don't believe there will be any issues around capital.
5 You've got a sense of just how strong our liquidity position is." Lehman's shares fell to $25.14
6 on June 17, 2008, down $2.06 or 7.57% from their June 16, 2008 closing price of $27.20.

7          133.     On July 10, 2008, Lehman filed its Quarterly Report on Form 10-Q with the SEC
8 for the quarter ended May 31, 2008 (the "2Q08 10-Q"). Even at this late date, and despite the
9 growing financial crisis at Lehman, E&Y expressed no reservation about the value of Lehman's
10 assets or any scenario under which the Company might be unable to meet its obligations.

11          134.     Yet, just two months later, on September 10, 2008, Lehman released its third
12 quarter 2008 results and reported a staggering $3.9 billion loss, as well as another $7.8 billion in
13 gross writedowns on its residential and commercial real estate holdings. Defendant Fuld quickly
14 tried to consummate a sale of Lehman to several banks. However, unlike E&Y, the potential
15 suitors quickly determined upon access to Lehman's internal records that the value of Lehman's
16 assets had been grossly overvalued. Unable to complete a sale, Lehman's stock price tumbled to
17 $0.21 per share.

18          135.     On September 15, 2008, Lehman petitioned for bankruptcy, the largest corporate
19 bankruptcy in U.S. history.

20          136.     In congressional hearings before the House of Representatives Committee on
21 Oversight and Government Reform, Defendant Fuld refused to take any personal responsibility
22 for Lehman's demise, attributing it instead to a "financial tsunami" – i.e., a natural disaster.
23 However, Lehman's fall in the subprime mortgage crisis was a man-made disaster. Lehman was
24 not just deeply involved in the subprime mortgage market, it was instrumental in creating the
25 demand for the mortgages that it then packaged and swapped for enormous returns. Indeed,
26 while Defendant Fuld blamed the market for Lehman's demise in comments to the House,
27 internal Lehman documents produced to the House Committee reveal that Lehman recognized
28 the liquidity risks created by its portfolio and blamed its own policies for its condition:

❸
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

37

1    "•    WHY DID WE ALLOW OURSELVES TO BE SO EXPOSED?

2         •    CONDITIONS CLEARLY NOT SUSTAINABLE

3         •    SAW WARNINGS SIGNS

4         •    DID NOT MOVE EARLY/FAST ENOUGH

5              •    ILLIQUID ASSET ORIG'N TOO MUCH/TOO LONG

6              •    BEHAVED TOO MUCH INVESTORS, NOT TRADERS

7              •    NOT ENOUGH DISCIPLINE ABOUT CAPITAL ALLOCATION"

8    See Exhibit A attached hereto.  Another 2008 "Financial Supply/Demand Dynamics"

9    presentation stated: "Very few of the top financial issuers have been able to escape damage from

10   the subprime fallout" and warned that "a small number of investors account for a large portion of

11   demand [for Lehman issues], liquidity can disappear quite fast."  See Exhibit B attached hereto.

12   **F.    The Central Role Of Ernst & Young**

13        137.    E&Y served as Lehman's outside auditor for decades, including throughout the

14   relevant period. Lehman retained E&Y to conduct quarterly reviews of its interim financial

15   results and to conduct the annual audit of the Company's fiscal results, including for fiscal years

16   ending in 2005, 2006 and 2007. As the "independent" auditor, E&Y was responsible for

17   conducting audits on Lehman's financial statements and issuing audit reports, knowing that they

18   would be used and relied upon by prospective and existing investors of Lehman, as well as

19   analysts, in evaluating the purchase and holding of Lehman securities. Indeed, the reports were

20   specifically addressed to Lehman's stockholders. Thus, the District was an intended beneficiary

21   of E&Y's audit reports.

22        138.    By virtue of its long history with Lehman, and Defendant Goldfarb's duel

23   affiliation as a former partner with E&Y and a member of Lehman's Executive Committee, E&Y

24   was intimately familiar with Lehman's business model, its employees, its products, and its

25   increasing exposure by virtue of its real estate and mortgage security holdings. Moreover, in the

26   course of its work, including its audit planning procedures for the audits of fiscal years 2005,

27   2006 and 2007, E&Y reviewed Lehman's internal controls, paying specific attention to real estate

28   asset valuations and risk exposure. E&Y audited large transactions and received from Lehman

❂
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

38

1  numerous materials concerning those transactions. E&Y participated in drafting and reviewing
2  Lehman's quarterly press releases, which announced Lehman's performance, financial condition,
3  asset valuations and revenues. E&Y reviewed drafts of Lehman's filings with the SEC prior to
4  filing. E&Y also attended and made presentations at Board of Director and Committee
5  meetings, where it discussed the results of its examination of Lehman's financial statements.

6      139.    With respect to its audit work, E&Y provided "clean" audit opinions included in
7  Lehman's Form 10-K for 2005, 2006 and 2007, confirming that E&Y had conducted its audit in
8  accordance with GAAS and that based on its review, Lehman's financial statements fairly
9  presented the Company's financial position for fiscal years 2005, 2006 and 2007, in accordance
10 with GAAP.

11     140.    As noted above, these clean audit reports were critical to Lehman's ability to
12 continue raising money from its debt offerings investments. E&Y had unique access to the
13 underlying information used to prepare the Company's financial statements, which was not
14 available to the public, and was well aware that Lehman was differentiating itself from its
15 competitors. As reported later, in June 2008, by the New York Times: "From the outside, it is
16 impossible to know if Lehman is marking its assets at appropriate levels, or whether it should
17 have taken write-downs earlier than it did. Like other Wall Street firms, it does not disclose its
18 specific assets, or how much it thinks they are worth. But what is clear is that Lehman's strategy,
19 as the subprime mortgage crisis unfolded and expanded, was to seek to differentiate itself as
20 being so well managed that it would not have the problems other firms might have."

21     141.    E&Y was also well aware that investors, like the District, were relying on it to
22 investigate and confirm that Lehman's financial condition was accurately reported. E&Y
23 promoted itself as one of the foremost accounting firms in the world, with special experience in
24 real estate and sophistication in accounting for complex capital markets. For example, E&Y's
25 website touted its Global Real Estate Center and dedicated professionals offering "deep technical
26 experience" in accounting rules applicable to real estate assets and the most critical audit risks.
27 E&Y also promoted its multi-disciplinary business to address the particular risks for audit clients
28 invested in real estate, combining the skills of audit, tax, advisory and valuation professionals,

❸
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

39

1    and that it provided services to 31% of all publicly traded real estate investment trusts

2    ("REITS"), more than 50 of the leading real estate investment funds (including those sponsored

3    by Lehman), and 7 of the 10 largest homebuilders in the United States.

4        142.    Similarly, E&Y recognized that prospective and existing investors in Lehman,

5    like the District, were the intended beneficiaries of its work, and specifically addressed their

6    reports both to Lehman's Board *and* to its stockholders. Similarly, in the firm's 2007 Global

7    Review, E&Y's Chairman and Chief Executive Officer, Jim Turley, lauded the firm's unique

8    understanding of the complex world of capital markets, and its assiduous pursuit of conservative

9    asset valuation policies for the benefit of *investors*:

10        We're bringing *the right level of financial skepticism to critical areas such as*
         *fair-value determinations, reserving, off-balance sheet structures, and liquidity*.
11        We're requiring consultation with our professional practice leaders on significant
         or unusual matters. We're focusing attention on events that occur in these volatile
12        markets subsequent to the date of financial statements. And we're carefully
         reviewing *client disclosures for timeliness and transparency*.

13

                                    * * *

14        As a profession we are very aware that when we are performing an audit *we are*
         *working for the owners of the business – the investors – and not the*
15        *management*. And so we see it as our responsibility to engage with our
         stakeholders, and to speak out and provide leadership on important public policy
16        maters affecting the capital markets.

17    See Exhibit C attached hereto, emphasis added.

18        143.    E&Y knew that the entire point of an audit is to protect the Company's

19    *investors*, who do not have access to inside information. This is consistent with the United

20    States Supreme Court's pronouncement relating to the special "public watchdog" role of an

21    accountant in assuring the accuracy of financial statement:

22        By certifying the public reports that collectively depict a corporation's financial status,
         the independent auditor assumes a *public responsibility transcending any employment*
23        *relationship with the client*. The independent public accountant performing this special
         function owes *ultimate allegiance to the corporation's creditors and stockholders, as*
24        *well as the investing public. This "public watchdog" function demands that the*
         *accountant maintain total independence from the client at all times and requires*
25        *complete fidelity to the public trust*. To insulate from disclosure a certified public
         accountant's interpretations of the client's financial statements would be to ignore the
26        significance of the accountant's role as a disinterested analyst charges with public
         obligations.

27

28


LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

1     *U.S. v. Arthur Young & Co.* (1984) 465 U.S. 805, 817-18 (emphasis added); *accord Bily v.*

2     *Arthur Young & Co.* (1992) 3 Cal.4th 370, 383-84; *National Medical Transp. Network v.*

3     *Deloitte & Touche* (1998) 62 Cal.App.4th 412, 428-29.

4     144.   E&Y was also well aware of the particular audit risks at Lehman, given the

5     investment bank's extensive real estate-related assets. Whereas safe and sound banking practice

6     requires reserves that reflect losses inherent in a loan portfolio, higher reserves means lower

7     reported earnings. A basic principle of financial accounting standards requires not only accurate

8     financial statements, but also the recording of loan losses. Thus, E&Y recognized the risk of

9     nonpayment, especially of subprime loans, as well as the risk of a downturn in the economy and

10     the dangers of an overconcentrated investment in mortgage-backed securities. Indeed, the risks

11     inherent in securitizations of debt were known to auditors for years. Though seen as a way to

12     remove loans from the originating bank's balance sheet, securitization programs in many cases

13     also had the effect of masking true risk and creating a system in which loan quality became

14     secondary to quantity.

15     145.   E&Y also recognized the audit risk created by Lehman's exposure to even a

16     minor downturn in the market, and the fact that Lehman's competitors had decided to take

17     recognize large losses on similar assets.

18     146.   In addition, E&Y recognized that Lehman's management had a built-in incentive

19     to inflate Lehman's financial condition and the value of its assets, given the Company's

20     compensation structure. Indeed, the Officer Defendants stood to receive massive bonuses and

21     other rewards under the Company's compensation plans, directly tied to short-term benchmarks

22     such as percentage increases in Lehman's fiscal 2007 net revenues, pretax income, net income,

23     and earnings per share over fiscal 2006. Lehman also awarded additional compensation to

24     executives for purportedly "[s]uccessfully navigating the difficult credit and mortgage market

25     environments and maintaining the Firm's strong risk controls."

26     147.   As a result, according to Forbes.com, Defendant Fuld was the 11th highest paid

27     CEO in the United States in fiscal 2007, receiving a total of $71.90 million. His 5-year

28     compensation totaled over $350 million or approximately $70 million per year. In the

❸
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

41

1 Company's March 5, 2008 Proxy Statement, Fuld's compensation for Fiscal 2007 was
2 purportedly justified, by "his role in leading the Company through the challenging market
3 environment, and orchestrating the Company's strategic direction and objectives including the
4 continued diversification of the Company across businesses, regions and products which was
5 important to the Company's financial performance in Fiscal 2007." The other Officer
6 Defendants also were rewarded handsomely, collectively earning tens of million of dollars in
7 salary and bonuses for fiscal year 2007.

8 148. However, contrary to its public statements and its professional duties to Lehman's
9 investors, E&Y failed to design or perform its audit in a manner to account for these audit risks,
10 and therefore was unable to provide unqualified opinions regarding Lehman's financial
11 statements.

12 149. The entire purpose of an audit is to obtain an opinion that the financial statements
13 fairly present, in all material respects, the financial position of the company in conformity with
14 accounting principles generally accepted in the United States ("GAAP"). These principles are
15 further clarified by Statements on Auditing Standards ("SAS") that are referred to with an "AU"
16 number. The auditor has the affirmative duty to plan and perform the audit to obtain *reasonable*
17 *assurance* that the financial statements are free of material misstatement, whether caused by
18 error or fraud. AU 110.02.

19 150. To obtain such reasonable assurance, the independent auditor has to perform
20 specific procedures called for by GAAS and, after performing such procedures, determine if
21 anything came to his or her attention that would lead them to believe that the financial statements
22 were not fairly presented in accordance with GAAP. AU 722.09. Indeed, the audit process
23 *requires professional skepticism* in order to properly test management's representations so that
24 the auditor actually has a reasonable basis on which to form an opinion regarding the financial
25 statements. AU 333.02. The audit opinion is valuable precisely because the auditor is
26 supposedly conducting an *independent* and *skeptical* examination of the information provided by
27 management.

28

Ⓦ
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

42

1    151.    Thus, the auditor must consider both audit risk and materiality in (1) planning the

2    audit and designing audit procedures, and (2) in evaluating the results of the audit in relation to

3    the financial statements as a whole.   AU 312.12.   The auditor must plan the audit to obtain

4    reasonable assurance of detecting material misstatements that it believes could be large enough,

5    individually or in the aggregate, to be quantitatively material to the financial statements.   AU

6    312.20.

7    152.    E&Y failed to adhere to these basic accounting principles.   As a result, its audit

8    reports misrepresented the true financial condition of Lehman and misrepresented that it had

9    conducted its audits in compliance with professional standards of care.   In performing its audit

10   work for Lehman, E&Y agreed and had a duty to perform such work in conformity with GAAP,

11   as well as the standard of care established by the American Institute of Certified Public

12   Accountant ("AICPA"), including the GAAS' Ten (10) Professional Standards of Care:

13   ### General Standards

14   1. The audit must be performed by a person or persons having adequate technical training
     and proficiency as an auditor.

15
16   2. In all matters relating to the assignment, an independence in mental attitude is to be
     maintained by the auditor or auditors.

17   3. Due professional care is to be exercised in the planning and performance of the audit
     and the preparation of the report.

18
19   ### Standards of Field Work

20   4. The work is to be adequately planned and assistants, if any, are to be properly
     supervised.

21   5. A sufficient understanding of internal controls is to be obtained to plan the audit and to
     determine the nature, timing, and extent of tests to be performed.

22
23   6. Sufficient competent evidential matter is to be obtained through inspection,
     observation, inquiries, and confirmations to afford a reasonable basis for an opinion
     regarding the financial statements under audit.

24
     ### Standards of Reporting
25
26   7. The report shall state whether the financial statements are presented in accordance with
     Generally Accepted Accounting Principles.

27   8. The report shall identify those circumstances in which such principles have not been
     consistently observed in the current period in relation to the preceding period.

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

9. Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

10. The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

153. Based upon its annual audit and quarterly reviews, E&Y knew or recklessly disregarded the true financial condition and exposure of Lehman, the value of Lehman' real estate loan "assets," the true credit risk of debt securities sold to investors like the District, and Lehman's deteriorating financial condition, which contradicted the unqualified audit reports on Lehman's financial statements meant to be distributed to the market and to Lehman shareholders. E&Y's reports used by Lehman to promote its securities to the market were issued in clear violation of professional standards and fiduciary duties.

154. Based upon its annual audit and quarterly reviews, E&Y also knew or should have known about the inadequate internal control structure. Indeed, E&Y discussed with Lehman's management, including the Board and Committees, responsibility for establishing and maintaining adequate internal controls for Lehman and for ensuring that the Company's financial statements were based on accurate financial information, including that Lehman:

(a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

    (i) transactions are executed in accordance with management's general or specific authorization;

    (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

Nonetheless, E&Y certified Lehman's financial statements, while knowing that Lehman's internal controls were inadequate.

1       155.    The misstatements of Lehman's quarterly and annual financial statements were

2  material and in violation of GAAP. E&Y breached its professional responsibilities and acted in

3  violation of GAAP and GAAS in its review of the above-specified quarterly financials and audits

4  of the annual financial statements of Lehman.

5       156.    E&Y violated GAAS General Standard No. 3, which requires the auditor to

6  exercise due professional care in the performance of the audit and preparation of the audit report.

7       157.    E&Y violated GAAS Reporting Standard No. 1, which requires the audit report to

8  state whether the financial statements are presented in accordance with GAAP. E&Y's audit

9  opinion falsely represented that Lehman's financial statements complied with GAAP. For

10  example, E&Y and the other Defendants failed to comply with FAS 157, which required that

11  financial instruments and other inventory positions must be reported at fair value.

12      158.    E&Y violated GAAS Field Standard No. 1, and the standards set forth in AU

13  sections 310, 320, 327, and others, by failing to adequately plan its audit and properly supervise

14  the work of assistants so as to establish and carry out procedures reasonably designed to search

15  for and detect the existence of errors and irregularities which would have a material effect upon

16  the financial statements.

17      159.    E&Y violated AU section 316, which requires the auditor to plan and perform its

18  examination of the financial statements with professional skepticism. Section 316 begins with

19  the statement that: "the auditor has a responsibility to plan and perform the audit to obtain

20  reasonable assurance about whether the financial statements are free of material misstatement,

21  whether caused by error or fraud." AU §316.01. In Lehman's case, there were numerous audit

22  red flags and risk factors that alerted E&Y to the potential of misstatements.

23      160.    E&Y failed to expand its audit procedures and perform effective audit testing to

24  obtain more reliable, persuasive audit evidence because of the above-described significant risk

25  factors and audit red flags. As section 316 states, "[t]he nature of audit procedures may need to

26  be changed to obtain evidence that is more reliable or to obtain additional corroborative

27  information. For example, more evidential matter may be needed from independent sources

28  outside the entity." E&Y failed to obtain adequate confirmations and/or otherwise communicate

❸
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

45

1   directly with affiliates of Lehman regarding the true value and exposure from Lehman's real

2   estate assets and failed to fully understand the relationships between the parties, despite

3   knowledge of risk factors and audit red flags that required action on E&Y's part. Section 316.27,

4   which discusses the need to exercise professional skepticism in response to the risk of material

5   misstatement, directs: (a) increased sensitivity in the selection of the nature and extent of

6   documentation to be examined in support of material transactions, and (b) increased recognition

7   of the need to corroborate management explanations or representations concerning materials

8   matters.

9       161.    E&Y violated AU section 722, which requires the auditor to ensure that the Audit

10  Committee of the Board of Directors is aware of, and responds appropriately to, any irregularities

11  that the auditor discovers as part of a review of interim financial information to be filed with a

12  regulatory agency, such as the SEC.

13      162.    E&Y violated AU section 722.18, which states: "If, in performing a review of

14  interim financial information, the accountant becomes aware of information that leads him or her

15  to question whether the interim financial information to be reported conforms with generally

16  accepted accounting principles, the accountant should make additional inquiries or employ other

17  procedures he or she considers appropriate to provide the limited assurance for a review

18  engagement." In view of all the previously described risk factors and audit red flags at Lehman,

19  E&Y should have made additional inquiries, including further communications with customers

20  and other related parties, as described above.

21      163.    By giving of the unqualified audit opinions for the Lehman financial statements

22  for fiscal years 2005, 2006 and 2007, E&Y certified that its audit of Lehman's books and records

23  was done in accordance with GAAP and GAAS. It was not. Thus, E&Y's statements were

24  materially misleading.

25  / / /

26  / / /

27  / / /

28


LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  **V.    CAUSES OF ACTION**

2  **FIRST CAUSE OF ACTION**

3  **(Fraud and Deceit)**

4        164.    Plaintiff incorporates and realleges each of the foregoing paragraphs, as though

5  fully set forth herein and further alleges as follows.

6        165.    Defendants, and each of them, made material representations and omissions to

7  Plaintiff which were false and misleading, including those contained in press releases, public

8  statements, financial statements, SEC filings, registration statements, offering documents and

9  other disclosures made by Defendants, described above.

10        166.    Defendants failed to disclose Lehman's exposure to loss from its mortgage-

11  related investments and its failure to write down mortgage-related assets to reflect their true fair

12  value. Moreover, Defendants failed to disclose that certain mortgage-related assets, including

13  Alt-A mortgages, could not be effectively hedged to mitigate losses, and that Lehman's hedging

14  activities exposed investors to additional losses. In addition, Defendant E&Y issued unqualified

15  audit reports on Lehman's financial statements in 2005, 2006 and 2007, which they knew and

16  intended would be read and relied upon by prospective and existing investors in Lehman

17  securities, like the District, and which were in fact read and relied upon by the District in making

18  its investment decisions.

19        167.    When Defendants, and each of them, made the representations and failed to

20  disclose and suppressed information they had a duty to disclose, as set forth hereinbefore,

21  Defendants had knowledge of the falsity of their statements and representations and knew that

22  they were failing to disclose material facts which they had a duty to disclose.

23        168.    Defendants made the misrepresentations and omitted the material facts with the

24  intent to defraud Plaintiff and to induce Plaintiff to purchase and hold Lehman securities.

25        169.    At the time these misrepresentations were made and the material facts not

26  disclosed, and at the time that Plaintiff took the actions herein alleged, Plaintiff was ignorant of

27  the true facts. If Plaintiff had known the true facts, it would not have invested in or continued to

28  hold Lehman securities.

❀
LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

1    170. Plaintiff reasonably relied on these representations, including E&Y's unqualified
2  audit reports, in investing in and continuing to hold Lehman securities and its reliance was
3  justified since the Defendants concealed the true facts.

4    171. Defendants knew that a fraud was occurring in the representations about Lehman.
5  Notwithstanding their knowledge of this improper and unlawful conduct, these Defendants, and
6  each of them, engaged in conduct, hereinbefore described which rendered substantial assistance
7  to, encouraged and/or aided and abetted the fraud.

8    172. With knowledge of the unlawful purpose of the fraud, Defendants, and each of
9  them, entered into an agreement to accomplish the aforesaid scheme, and by their actions took
10  steps to further that scheme.

11    173. As a direct and proximate result of the wrongful conduct of each of the
12  Defendants, Plaintiff has suffered and will continue to suffer economic losses and other general
13  and specific damages, all in an amount to be determined according to proof.

14    174. The aforementioned acts of Defendants, and each of them, were done
15  maliciously, oppressively, and with intent to defraud, and Plaintiff is entitled to punitive and
16  exemplary damages in an amount to be shown according to proof at the time of trial.

17                    **SECOND CAUSE OF ACTION**

18                    **(Negligent Misrepresentation)**

19    175. Plaintiff incorporates and realleges each of the foregoing paragraphs, as though
20  fully set forth herein and further alleges as follows.

21    176. Defendants, and each of them, negligently made material representations to
22  Plaintiff which were false and misleading, including those contained in press releases, public
23  statements, SEC filings, financial statements, registration statements, offering documents and
24  other disclosures made by Defendants, described above. Defendants failed to disclose Lehman's
25  exposure to loss from its mortgage-related investments and its failure to write down mortgage-
26  related assets to reflect their true fair value. Moreover, Defendants failed to disclose that certain
27  mortgage-related assets, including Alt-A mortgages, could not be effectively hedged to mitigate
28  losses, and that Lehman's hedging activities exposed investors to additional losses. In addition,

❸
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1    Defendant E&Y issued unqualified audit reports on Lehman's financial statements in 2005, 2006
2    and 2007, which they knew and intended would be read and relied upon by prospective and
3    existing investors in Lehman securities, like the District, and which were in fact read and relied
4    upon by the District in making its investment decisions.

5        177.    When Defendants, and each of them, made the representations, as set forth
6    hereinbefore, Defendants had no reasonable ground for believing them to be true.  Defendants
7    made positive assertions in a manner not warranted by the information in their possession.
8    Defendants made these assertions to induce the reliance of Plaintiff and to induce Plaintiff to
9    purchase and hold Lehman securities.

10       178.    At the time these misrepresentations were made and the material facts not
11   disclosed, and at the time that Plaintiff took the actions herein alleged, Plaintiff was ignorant of
12   the true facts. If Plaintiff had known the true facts, it would not have invested in or continued to
13   hold Lehman securities, and would have disposed of them immediately.

14       179.    Plaintiff reasonably relied on these representations, including E&Y's unqualified
15   audit reports, in investing in and continuing to hold Lehman securities and its reliance was
16   justified.

17       180.    Defendants, and each of them, engaged in conduct, hereinbefore described which
18   rendered substantial assistance to, encouraged and/or aided and abetted the others' conduct.

19       181.    With knowledge of the unlawful purpose of the fraud, Defendants, and each of
20   them, entered into an agreement to accomplish the aforesaid scheme, and by their actions took
21   steps to further that scheme.

22       182.    As a direct and proximate result of the wrongful conduct of each of the
23   Defendants, Plaintiff has suffered and will continue to suffer economic losses and other general
24   and specific damages, all in an amount to be determined according to proof.

25   / / /

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

49

## THIRD CAUSE OF ACTION

### (Breach of Fiduciary Duty)

183.    Plaintiff incorporates and realleges each of the foregoing paragraphs, as though fully set forth herein and further alleges as follows.

184.    By virtue of Plaintiff's ownership of the securities that are the subject of this Complaint, the Individual Defendants, and each of them, as officers and directors of Lehman, owed fiduciary duties of the highest good faith, integrity and fair dealing to Plaintiff as holders of the securities. The Individual Defendants, and each of them, further owed fiduciary obligations to Plaintiff as they sought to induce, knowing its particular circumstances, and did induce Plaintiff to purchase and hold the securities.

185.    The Individual Defendants and each of them, had insider knowledge of adverse non-public information regarding the securities as alleged above. Defendants knowingly and intentionally concealed this adverse non-public information from the Plaintiff.

186.    The Individual Defendants, and each of them, breached and violated their fiduciary obligations to Plaintiff, to the detriment of Plaintiff, by failing to disclose all material information known to them at the time that Plaintiff purchased the securities, and by making the above-mentioned misrepresentations to induce Plaintiff to purchase and hold the securities or to take other actions.

187.    As set forth above, the Individual Defendants and Defendant E&Y knew that Lehman was engaged in fraudulent conduct, and that Lehman was breaching its fiduciary duty to its shareholders. Notwithstanding their knowledge of the improper and unlawful conduct, the Defendants, and each of them, engaged in conduct, hereinbefore described which rendered substantial assistance to, encouraged and/or aided and abetted the breach of fiduciary duty.

188.    With knowledge of the unlawful purpose of the conduct of Lehman, the Defendants, and each of them, entered into an agreement to accomplish the aforesaid scheme, and by their actions took steps to further that scheme.

⊛
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1      189.   As a result of the wrongful conduct of each of the Defendants, Plaintiff has

2 suffered and will continue to suffer economic losses and other general and specific damages, all

3 in an amount to be determined according to proof.

4      190.   The aforementioned acts of Defendants, and each of them, were done maliciously,

5 oppressively, and with intent to defraud, and Plaintiff is entitled to punitive and exemplary

6 damages in an amount to be shown according to proof at the time of trial.

7      WHEREFORE, Plaintiff prays for relief as set forth below.

8                           **FOURTH CAUSE OF ACTION**

9            **(Violation of California Corporations Code § 25400 *et seq.*)**

10      191.   Plaintiff hereby realleges and incorporates by reference each of the foregoing

11 paragraphs as though fully set forth herein and further alleges as follows.

12      192.   Defendants, and each of them, acting individually and pursuant to a

13 scheme and conspiracy, directly and indirectly, induced the purchase and retention of the

14 securities by the Plaintiff by circulating or disseminating, in or from California, information that

15 falsely described Lehman's financial condition and exposure, as described above, for the purpose

16 of inducing Plaintiff to purchase and hold the securities. Defendants knew or had reason to

17 believe that their statements were false or misleading in light of the circumstances under which

18 they were made. As a result of the misrepresentations, Defendants knew that investors like

19 Plaintiff would be misled and would purchase and hold securities based upon false information.

20 Despite this knowledge, Defendants continued to make the misrepresentations in order to induce

21 investors to purchase and hold securities.

22      193.   Defendants, and each of them, also knowingly provided substantial assistance to

23 the other Defendants in violation of the Corporations Code Section 25403.

24      194.   Defendants, and each of them are liable for wilfully participating in acts or

25 transactions in violation of Corporations Code Sections 25400 and 25403, and thus are liable to

26 Plaintiff, which purchased its securities at a price which was affected by Defendants' acts, for

27 damages sustained by Plaintiff as a result of such acts or transactions.

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

195. As a direct and proximate result of the wrongful conduct of Defendants and each of them, Plaintiff has sustained economic losses and other general and special damages, including damages pursuant to Section 25500, in an amount to be determined according to proof at the time of trial.

196. Plaintiff is entitled to an award of prejudgment interest at the legal rate on their economic damages, pursuant to Section 25500.

WHEREFORE, Plaintiff prays for relief as set forth below.

## FIFTH CAUSE OF ACTION

### (Violations of Section 11 of the Securities Act)

197. Plaintiff incorporates and realleges each of the foregoing paragraphs, but excluding any allegation of fraudulent intent, as though fully set forth herein and further alleges as follows. This claim does not sound in fraud, and neither fraud nor scienter is an element of this claim. This claim is not alleged against Defendant E&Y.

198. Plaintiff purchased Lehman securities issued pursuant to a registration statement. Plaintiff purchased or acquired these securities pursuant to, or traceable to, registration statements signed by or on behalf of Defendants or which identified those individuals as officers or directors of Lehman.

199. The registration statements, at the time they were issued and became effective, were inaccurate and misleading, contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements made therein not misleading, as set forth above. The matters detailed above would have been material to a reasonable person reviewing the registration statements and the financial statements incorporated therein.

200. Defendants were responsible for the contents and dissemination of the registration statements and are liable under Section 11 of the Securities Act for any material misrepresentations or omissions contained therein. Defendants did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements contained in the registration statements were true, did not omit any material fact, and were not materially misleading.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1       201.    Plaintiff did not know or in the exercise of reasonable diligence could not have

2   known of the misstatements and omissions of material fact contained in the registration

3   statements.

4       202.    Plaintiff has sustained damages as a result of the misstatements and omissions of

5   material fact contained in the registration statements for which it is entitled to compensation.

6       203.    Defendants owed the purchasers of the securities, including Plaintiff, the duty to

7   make a reasonable and diligent investigation of the statements contained in the registration

8   statements at the time they became effective, to ensure that they were true and that there was no

9   omission to state a material fact required to be stated in order to make the statements contained

10   therein not misleading. In the exercise of reasonable care, Defendants knew or should have

11   known of the material misstatements and omission contained in the registration statements.

12   Moreover, these Defendants knew of the misconduct of the other Defendants and failed to advise

13   the Plaintiff of this misconduct.

14       WHEREFORE, Plaintiff prays for relief as set forth below.

15                         **SIXTH CAUSE OF ACTION**

16                 **(For Violations of Section 15 of the Securities Act)**

17       204.    Plaintiff incorporates and realleges each of the foregoing paragraphs, but

18   excluding any allegation of fraudulent intent, as though fully set forth herein and further alleges

19   as follows.

20       205.    Plaintiff asserts this cause of action against Defendants under Section 15 of the

21   Securities Act. This claim does not sound in fraud, and neither fraud nor scienter is an element

22   of this claim. This claim is not alleged against Defendant E&Y.

23       206.    Defendants, by reason of their management positions, membership or

24   representations on Lehman's board of directors, or stock ownership, were controlling persons

25   within the meaning of Section 15 of the Securities Act, 15 U.S.C. § 77o. Defendants had power,

26   influence and control, and exercised it to cause Lehman to engage in the violations of law

27   complained of herein.

28

207. Accordingly, Defendants are liable under Section 15 of the Securities Act.

208. As a result of Defendants' wrongdoing, Plaintiff has suffered damages, in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

## VI.    PRAYER FOR RELIEF

1. Compensatory and general damages according to proof;

2. Special damages according to proof;

3. Restitution according to proof;

4. Prejudgment interest at the maximum rate;

5. Punitive and exemplary damages according to proof;

6. Costs of the proceedings herein;

7. Reasonable attorneys fees; and

8. All such other and further relief as the Court deems just and proper.

## VII.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Dated: June 12, 2009                              COTCHETT, PITRE & McCARTHY

By: _____
         MARK C. MOLUMPHY

*Attorneys for Contra Costa Water District*

# Exhibit A

- WHAT HAPPENED & WHY

- NEAR TERM – WHAT WE HAVE DONE & MUST DO

- LONGER TERM – WHERE INDUSTRY AND FIRM GOING

- WHAT HAPPENED...

  - MONT'RY POL: MANAGE RELATION INT RATES, GDP, INFL

  - COUPLE SIGNIFICANT SHOCKS – DOT-COM, 9/11

  - POLICY WENT TOO LOOSE; RATES TOO LOW, TOO LONG

  - ASSET PRICE↑, LEV↑, COMPLEXITY↑, PRICE OF RISK↓

  - 2007: RISING RATES → SEVERE DISLOCATION

  - SLOW CEN BNK RESP →LIQUID PROB → ASSET QUAL PROB

- WHY DID WE ALLOW OURSELVES TO BE SO EXPOSED?

  - CONDITIONS CLEARLY NOT SUSTAINABLE

  - SAW WARNING SIGNS

  - DID NOT MOVE EARLY/FAST ENOUGH

    - ILLIQUID ASSET ORIG'N TOO MUCH/TOO LONG

    - BEHAVED TOO MUCH INVESTORS, NOT TRADERS

  - NOT ENOUGH DISCIPLINE ABOUT CAPITAL ALLOCATION

I

CONFIDENTIAL

LB 011894

# Exhibit B



ial Supply/Demand

LEHMAN BROTHERS

CONFIDENTIAL

LB 010443

Very few of the top financial issuers have been able to escape damage from the subprime fallout . . .




CONFIDENTIAL

LB 010450



And a small number of investors accounting for a large portion of demand, liquidity can disappear quite fast . . .

Recent Lehman Issues — Number of Accounts vs. % of Deal Purchased

LEHMAN BROTHERS

CONFIDENTIAL

LB 010456

# Exhibit C



Global Review
2007

ERNST & YOUNG
Quality In Everything We Do

**Jim Turley**
Chairman and Chief Executive Officer



2

# Chairman's letter

## Achieving potential — making a difference

The forces shaping Ernst & Young today are those that are shaping our world as a whole: continued globalization stimulated by the ongoing rise of the emerging markets; the introduction of new financial and investment models; dramatic demographic shifts; and innovative technologies. What do these changes mean for the world economy, for people, for our profession and for our own organization? How can we address the challenges they present to business and society? How can we help people and companies capitalize on the opportunities?

At Ernst & Young we think about things broadly — about the world around us; about all the potential that exists everywhere, and then about our place in the world. Over the last 15 years, billions of people have joined the global economic system. This influx has remade the world. Barriers have lowered. Wealth has increased. And the potential these people represent has just started to be fulfilled.

Understanding the potential in the world around us is just our starting point. The challenge that we set for ourselves is to go beyond identifying potential, to actually making a difference. A difference for our people, for the companies we serve, and for society as a whole.

It all starts with our own people — 130,000 talented individuals whose aspirations are as diverse as the people themselves. Our goal is to help each one of them to reach their personal and professional goals and find fulfillment in their work, in an organization known for having the best teaming culture in the profession.

In turn, our people ensure the success of our organization, by delivering their highest quality work for our clients. That quality work is the responsibility of everyone at Ernst & Young. We recognize it is critical to building confidence in our profession and the capital markets, as well as to enhancing our own reputation.

For the clients we serve, we also focus on making a difference. Through the services we deliver — whether assurance, tax, transactions or advisory — we help our clients earn the confidence of investors, better manage their risks, strengthen their controls, improve aspects of their business and increase their value. Our client work makes a difference for everyone who participates in the capital markets, from the regulators who oversee them, to workers counting on their livelihood and pensions, to investors everywhere.

But the impact we have goes further than our people and our clients; it extends to the communities in which we live. In the emerging markets, we donate our time to promote entrepreneurship and sound corporate governance, and to attract foreign investment. In each of the communities in which we live and work, we make a difference through not only the contributions of our financial resources, but also the substantial volunteering of the time and talents of our people. Often, such efforts are focused on building financial literacy and enhancing access to educational opportunities for people around the world. In this way we can leverage our own organization's world-class capabilities for the benefit of the world around us.

During the 2007 financial year, Ernst & Young again enjoyed solid financial success. Our worldwide revenues increased to US$21.1 billion, representing a year-on-year increase of US$2.7 billion and a growth rate of 15%. This strong financial performance was achieved through the dedicated efforts of our people and each one of them should take pride in the result. I am proud of each of them and want to thank them all.

Striving to make a difference, and knowing you are making a difference, is perhaps the most fulfilling feeling one can have. What inspires me the most is the way our people rally around our sense of purpose. For that I am truly grateful.

James S. Turley
Chairman and Chief Executive Officer
Ernst & Young

3

# Chairman and CEO Jim Turley on the issues facing business, our profession, and our organization.

Jim, you spend a lot of your time traveling and speaking with business leaders around the world. How are they feeling about the global economy and business today?

From the people I speak with, I'd say there's a cautious optimism out there. There's a positive feeling that the economic fundamentals remain strong across many regions. There's also recognition that globalization is having many positive effects — creating wealth and improving people's lives — particularly in the emerging markets.

However, there remains a high degree of uncertainty and risk aversion in the financial markets and in the banking sector. The turbulence is a long way from settling out — and I don't think it's possible for anyone to say right now just what the long-term effects are going to be. But there is also a general sense that the world economy is better able to deal with events such as the credit crunch than it used to be.

Let me just add that most leaders today see that we are in a period of profound transformation globally. The economic rebalancing that is occurring among developed, developing and emerging markets, and the societal challenges we face have a lot of business leaders taking a much harder look at the role of their own business in society and have countries re-examining their own role in the global economy.

How has the accounting profession reacted to the credit crunch?

There's no doubt that the situation we have in the credit markets is extremely complex — and it really shows us yet again how economic or business activity in one part of the world can so quickly have a global impact. Whatever its root causes, there's no question that the credit situation is causing deep concern in the markets. As for our profession, we've recognized this, and we've been taking an active role trying to help provide businesses and investors with greater clarity and transparency on some of the issues involved.

In October, the Center for Audit Quality — the CAQ — a US public-policy body that I chair, issued white papers on accounting issues related to the credit situation under US GAAP. The Global Public Policy Committee, or GPPC, a global body comprising the six largest audit organizations, also issued a similar paper in December, relating to IFRS. I think these are real contributions in challenging times. They help to clarify the appropriate accounting treatments and, more importantly, they help to give investors a greater sense of confidence in the consistency of the financial information they rely on to make their investment decisions. From the reactions we got to the papers, it was clear to me that investors appreciated hearing our voice and drew some comfort from it.

In terms of our client work, we've strengthened our global protocols and methodologies to carefully consider the effects on our clients' financial condition and prospects in all sectors and

4

jurisdictions. We're bringing the right level of financial skepticism to critical areas such as fair-value determinations, reserving, off-balance sheet structures, and liquidity. We're requiring consultation with our professional practice leaders on significant or unusual matters. We're focusing attention on events that occur in these volatile markets subsequent to the date of financial statements. And we're carefully reviewing client disclosures for timeliness and transparency. Personally, I've been pleased to see the profession — and Ernst & Young — take such a robust and comprehensive approach to what is clearly an issue of global importance.

In the changing world you describe, what role does the accounting profession play?

Our profession plays a critical role in the world's financial markets. And people everywhere are realizing more and more that the work that we do has a big impact on their lives — on the companies where they work, on the investments that they make, on the pensions on which they depend, as well as on the capital markets and the global economy as a whole. Our work gives people a sense that financial information is being presented fairly according to a common set of rules, whether that is accounting, tax, or transactions rules.

Over the last decade we've moved from being largely self-regulated to being a regulated and highly scrutinized profession. That's been good for us. We've welcomed this increased oversight of our work. We've renewed our commitment to quality. And we're working closely with regulators worldwide to what I believe is the benefit of both investors and our clients everywhere.

What is the biggest threat your profession faces?

Well, I think I need to distinguish between what I'd consider a challenge and what I'd call a threat. In this case they're separate issues — but they're both related to people. If you're talking about challenges that our profession faces, the biggest one has to be finding and mobilizing enough high-quality people around the world to meet the needs of our clients. This is especially true in markets such as China, where demand for our services is growing at an amazing rate, but is true in developed markets as well.

In terms of threats, I think the major one is the lack of respect for professional judgment in some countries. Over the long run, this can really undermine the relevance of what we do. It can also knock the pride of our people. An auditor's exercise of independent professional judgment is a vital component of the important work that auditors perform for the capital markets and the investing public. The information presented in financial statements is in part the result of a series of estimates and judgments made by management. Auditors must be willing to take a stand on behalf of investors when they

"Our business strategy is s    e. Have
the best people. Provide the best quality.
Success follows."   ·

disagree with the estimates or assessments made by management in arriving at the numbers presented in the financial statements. And regulators and the legal system must be able to respect good-faith professional judgments — judgments that are rational, well-considered, and documented.

**Does the current financial reporting model need reform?**
Yes. The current financial reporting system has served us very well, but it was built for a different time — a time that was much less global, a time that had financial instruments and models that were much less complex, and a time that was much less technology-enabled. Today investors are demanding financial reporting that not only can they trust, but also reflects today's fast-moving marketplace. Businesses are trying to find the right ways to express the value of their ever more sophisticated operations. And regulators are seeking to preserve the integrity and stability of increasingly complex systems.

Over the past year, our profession has been conducting dialogues with stakeholders around the world to discuss what the future of financial reporting should look like. What is clear is a consensus on the need for change. What that change should look like will take a lot more discussion and effort.

One thing on which many stakeholders do agree is that there is a compelling need for more consistency across national boundaries — in most everything. Companies today operate around the world, investors invest across borders, and what happens in one market can be felt in another on the opposite side of the world in the blink of an eye. But we still have inconsistent and overlapping financial accounting standards, auditing standards and oversight regimes. These kinds of inconsistencies are inefficient, confusing and increasingly outmoded in today's global market. As I have said in many forums, it is time to really address this issue.

**So are you calling for convergence?** That's a topic, especially in terms of IFRS and US GAAP, which has attracted a lot of attention this year. No. I want to make it clear that I am not calling for convergence of accounting standards. When people talk about convergence what they usually mean is moving different standards closer to each other. What I am calling for is the US to adopt International Financial Reporting Standards. Establishing a date certain for that shift from US GAAP to IFRS would enable US companies to begin preparing now and would provide the impetus to confront the required legal and regulatory changes that will be necessary to precede the shift to the more principles-based IFRS. It would promote similar moves by other countries to embrace these international standards instead of modifying them for their own local use. This would help countries

establish and work toward the improvement of a single standard, rather than devoting their energy to tweaking national standards to make them look more like IFRS. And it would motivate universities to train tomorrow's accountants in IFRS.

I wrote an opinion piece in the 9 November 2007 edition of The Wall Street Journal that explains my views in more depth. I think such truly global standards would bring greater efficiency to companies that currently have to pay internal and external legal and accounting experts to help them sort through accounting differences across multiple jurisdictions. And for investors, global standards would bring a new level of comparability and reliability for global investments. We just need to get on with it.

**What are the keys to achieving your stated promise to the market of seamless, consistent, high-quality client service, worldwide?**
Over the last several years, we have steadily strengthened our global organization to enable us to deliver on the promise we make to the market — to deliver seamless, consistent, high-quality client service, worldwide. This involves bringing together our 130,000 people, across 140 countries, through seven tightly integrated geographic Areas, in a controlled way in which we can truly meet the demands of our highly complex, global clients. We have aligned our infrastructure and streamlined our processes so we can focus our attention on meeting the unique demands of our clients anywhere and everywhere around the world.

However I think what gives us our competitive advantage is something more — our culture of teaming and inclusiveness, our global mindset, and our values-based commitment to our clients around the world. These "softer" things are what I see as critical.

**You've seen strong growth in Tax this year. Given the continued sensitivities toward tax planning around the world isn't this surprising?** No, not when you consider how important tax issues are to global business, and the ways in which we have reoriented our Tax practice, especially our tax advisory services. We have increased our focus on client relationships and our clients' most pressing business issues, while always remaining mindful of all of our responsibilities to broader stakeholders, including the tax authorities and capital markets regulators. We are helping our clients to focus on ways in which they can balance appropriate management of their tax costs and their responsibilities, and this is having positive results. Finally, we have engaged with the OECD's Forum of Tax Administrators, allowing us to move beyond compliance with national tax authorities into a constructive conversation with them. I'd like to see us continue this journey in the future..

The growth of your advisory services is outpacing the growth of your audit business. Are you heading back into consulting? 'Consulting' is a very broad and no longer particularly helpful term. It covers many services from business strategy through to implementation and outsourcing. Some parts of consulting — such as providing advice on risk management, process enhancement or performance improvement — not only sit well with the Ernst & Young brand but positively enhance our ability to deliver high-quality service to all our clients. These businesses are totally complementary to our other core businesses such as assurance, tax and transactions and are therefore central to our development plans for the future.

Other parts of the consulting market — such as systems implementation or outsourcing — require a different business model from our own. That was the consulting business we sold to Cap Gemini in 2000 and which we do not intend to re-enter. We have a depth and wealth of IT advisory expertise — we need it for both assurance and advisory services — but are not involved with IT systems implementation or IT outsourcing.

Around the world Ernst & Young is recognized for being a great place to work. How are you making that happen?
Well, first I have to emphasize that smart, motivated people are the foundation of our organization. So our business strategy is simple. Have the best people. Provide the best quality. Success follows. Attracting those people means providing a great place to work, and that's all about creating the right culture. What I hear from people who join us is how all of us — from senior leaders to interns — will take the time to listen to and engage with each other, and respect each other's views. That's important to us because we know that, in most cases, our people have the answers to whatever question or challenge we have. We need to be humble enough as an organization to listen to diverse ideas.

And our people understand that they are working in an organization where they make a difference — for each other, for our clients, for the financial markets and for the communities in which they live and work. It's really important to them. Not only in their professional lives, but in their personal lives as well.

While I'm happy that we are recognized for this culture in countries all over the world, I don't think that this is an area where we would ever rest on our laurels. Maintaining our diverse, inclusive culture is something we always work on and try to improve.

Earlier you mentioned chairing the Center for Audit Quality, and an opinion piece in *The Wall Street Journal*. Why are you speaking out more these days on accounting and business issues?
It's not just me speaking out. As a profession we are very aware that when we are performing an audit we are working for the owners of the business — the investors — and not the management. And so we see it as our responsibility to engage with our stakeholders, and to speak out and provide leadership on important public policy matters affecting the capital markets. After all, we can't expect to be both relevant to the capital markets and mute. We have to engage with our stakeholders in two-way communication. Listen to them and learn from them, and share our own views as well.

Finally, on a personal note, what's the most important thing you do in your role as Chairman and CEO?
Well, you asked me that question last year — and this is one thing that hasn't changed. I've always seen my most important job to be doing everything I can to ensure the people of Ernst & Young wake up every morning with a personal sense of what is right and what is wrong. I want everyone in Ernst & Young to be confident that no matter what happens, nothing is more important than their own personal integrity and commitment to quality. If anything or anyone makes them uncomfortable, at a client or within Ernst & Young, I want them to know that it is not just okay for them to object, or raise their hand, or ask for assistance, it is their personal and professional obligation to do so.

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road<br>Burlingame, CA 94010 | |

TELEPHONE NO.: 650-697-6000   FAX NO.: 650-697-0577
ATTORNEY FOR *(Name)*: Plaintiff

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

CASE NAME: Contra Costa Water District v. Richard S.
Fuld, Jr., et al.

ENDORSED
F I L E D
San Francisco County Superior Court

JUN 12 2009

GORDON PARK-LI, Clerk
BY: PARAM NATT
Deputy Clerk

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited  [ ] Limited<br>(Amount          (Amount<br>demanded      demanded is<br>exceeds $25,000)  $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CGC-09-489381<br>JUDGE:<br>DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[X] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more courts
       issues that will be time-consuming to resolve            in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive
4. Number of causes of action *(specify):* Fraud & Decit; Negligent Misrepresentation; Breach of Fiduciary Duty; Violations of CA Corp. Code 25400
5. This case [ ] is  [X] is not  a class action suit. Violation of Securities Act Sections 11 & 15
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM/015.)*
Date: June 12, 2009

Mark C. Molumphy (168009)
(TYPE OR PRINT NAME)                                      (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Legal<br>Solutions<br>Plus | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |

## SUMMONS
### *(CITACION JUDICIAL)*

**SUM-100**

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Richard S.Fuld, Jr., Christopher M. O'Meara, Joseph
M. Gregory, Erin Callan, Ian Lowitt, David Goldfarb,
John F. Akers, Roger S. Berlind, Marsha Johnson
Evans, Roland A. Hernandez, Henry Kaufman, Ernst &
Young, LLP and DOES 1 through 20,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Contra Costa Water District

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*
*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
San Francisco Superior Court
400 McAllister Street

San Francisco, CA 94102

**CASE NUMBER:**
*(Número del Caso):*
CGC 09.489381

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Mark C. Molumphy (168009)      650-697-6000      650-697-0577
Cotchett Pitre & McCarthy
840 Malcolm Road
Burlingame, CA 94010

DATE:    JUN 12 2009        Gordon Park-Clerk, by _____ P. NATT , Deputy
*(Fecha)*                              *(Secretario)*                                                    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. [✓] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)        [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*

4. [ ] by personal delivery on *(date):*

Page 1 of 1

**SUMMONS**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road, Ste. 200<br>Burlingame, CA 94010<br><br>TELEPHONE NO.: 650-697-6000   FAX NO. *(Optional)*: 650-697-0577<br>E-MAIL ADDRESS *(Optional)*: mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name)*: Plaintiff | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: San Francisco, CA 94102
CITY AND ZIP CODE
BRANCH NAME

PLAINTIFF/PETITIONER: Contra Costa Water District

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., Christopher M.
O'Meara, Joseph M. Gregory, Erin Callan, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CGC-09-489381 |
|---|---|

TO *(insert name of party being served)*: Ian Lowitt

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: 6/17/09

Mark C. Molumphy
(TYPE OR PRINT NAME)                           (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify)*: Civil Case Cover Sheet, ADR Court Packet and Notice of Case
   Management Conference

*(To be completed by recipient)*:
Date this form is signed: June 17, 2009
James G. Kreissman
(on behalf of Ian Lowitt)
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,          (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)                          ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Legal<br>Solutions<br>Plus | Code of Civil Procedure<br>§§ 415.30, 417.10 |

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road, Ste. 200<br>Burlingame, CA 94010<br><br>TELEPHONE NO 650-697-6000    FAX NO *(Optional)*  650-697-0577<br>E-MAIL ADDRESS *(Optional)*  mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name)*  Plaintiff | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco |
|---|
| STREET ADDRESS 400 McAllister Street |
| MAILING ADDRESS San Francisco, CA 94102 |
| CITY AND ZIP CODE |
| BRANCH NAME |

| PLAINTIFF/PETITIONER: Contra Costa Water District<br><br><br>DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., Christopher M.<br>O'Meara, Joseph M. Gregory, Erin Callan, et al. | |
|---|---|

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER<br>CGC-09-489381 |
|---|---|

TO *(insert name of party being served):* Henry Kaufman

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: 6/17/09

Mark C. Molumphy
(TYPE OR PRINT NAME)                                     (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing):*
1. ☒ A copy of the summons and of the complaint.
2. ☒ Other: *(specify):* Civil Case Cover Sheet, ADR Court Packet and Notice of Case Management

*(To be completed by recipient):*
Date this form is signed:  June 17, 2009
James G. Kreissman
(on behalf of Henry Kaufman)
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,              (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)                           ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | *Legal Solutions Plus* | Code of Civil Procedure<br>§§ 415.30, 417.10 |
|---|---|---|---|

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road, Ste. 200<br>Burlingame, CA 94010<br><br>TELEPHONE NO. 650-697-6000   FAX NO. *(Optional):* 650-697-0577<br>E-MAIL ADDRESS *(Optional):* mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name):* Plaintiff | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco |
|---|
| STREET ADDRESS: 400 McAllister Street |
| MAILING ADDRESS: San Francisco, CA 94102 |
| CITY AND ZIP CODE |
| BRANCH NAME |

| PLAINTIFF/PETITIONER: Contra Costa Water District | |
|---|---|
| DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., Christopher M.<br>O'Meara, Joseph M. Gregory, Erin Callan, et al. | |

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CGC-09-489381 |
|---|---|

TO *(insert name of party being served):* Roland A. Hernandez

---

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:   6/17/09

Mark C. Molumphy
(TYPE OR PRINT NAME)
▶  (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing):*
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify):* Civil Case Cover Sheet, ADR Court Packet and Notice of Case Management

*(To be completed by recipient):*
Date this form is signed: June 17, 2009
James G. Kreissman
(on behalf of Roland A. Hernandez)
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY, ON WHOSE BEHALF THIS FORM IS SIGNED)
▶  (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Legal<br>Solutions<br>& Plus | Code of Civil Procedure,<br>§§ 415.30, 417.10 |
|---|---|---|---|

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road, Ste. 200<br>Burlingame, CA 94010<br><br>TELEPHONE NO. 650-697-6000   FAX NO *(Optional)*.   650-697-0577<br>E-MAIL ADDRESS *(Optional)* mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name)* Plaintiff | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco |
|---|
| STREET ADDRESS: 400 McAllister Street |
| MAILING ADDRESS: San Francisco, CA 94102 |
| CITY AND ZIP CODE |
| BRANCH NAME |

| PLAINTIFF/PETITIONER: Contra Costa Water District |
|---|
| DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., Christopher M. O'Meara, Joseph M. Gregory, Erin Callan, et al. |

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER<br>CGC-09-489381 |
|---|---|

TO *(insert name of party being served)*: Joseph M. Gregory

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:   6/17/09

Mark C. Molumphy
(TYPE OR PRINT NAME)                              (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify)*: Civil Case Coversheet, ADR Court Packet and Notice of Case Management Conference

*(To be completed by recipient):*
Date this form is signed:   June 17, 2009
James G. Kreissman
(on behalf of Joseph M. Gregory)
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,     (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)                     ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Legal<br>Solutions<br>Plus | Code of Civil Procedure,<br>§§ 415.30, 417.10 |
|---|---|---|---|

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: <br> Mark C. Molumphy (168009) <br> Cotchett Pitre & McCarthy <br> 840 Malcolm Road, Ste. 200 <br> Burlingame, CA 94010 <br><br> TELEPHONE NO. 650-697-6000   FAX NO *(Optional)*  650-697-0577 <br> E-MAIL ADDRESS *(Optional)* mmolumphy@cpmlegal.com <br> ATTORNEY FOR *(Name)* Plaintiff | FOR COURT USE ONLY |
|---|---|

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS 400 McAllister Street
MAILING ADDRESS San Francisco, CA 94102
CITY AND ZIP CODE
BRANCH NAME.

PLAINTIFF/PETITIONER: Contra Costa Water District

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., Christopher M.
O'Meara, Joseph M. Gregory, Erin Callan, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER. <br> CGC-09-489381 |
|---|---|

TO *(Insert name of party being served)*: David Goldfarb

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: 6/17/09

Mark C. Molumphy
(TYPE OR PRINT NAME)                           (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing):*
1. ☒ A copy of the summons and of the complaint.
2. ☒ Other: *(specify):* Civil Cover Sheet, ADR Court Packet and Notice of Case
   Management Conference

*(To be completed by recipient):*
Date this form is signed:     June 17, 2009

James G. Kreissman
(on behalf of David Goldfarb)
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,          (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)                ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| Form Adopted for Mandatory Use <br> Judicial Council of California <br> POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Legal <br> Solutions· <br> Plus | Code of Civil Procedure, <br> §§ 415 30, 417 10 |
|---|---|---|---|

**POS-015**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>vanbroeklaw@earthlink.net<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road, Ste. 200<br>Burlingame, CA 94010<br><br>TELEPHONE NO 650-697-6000   FAX NO *(Optional)* 650-697-0577<br>E-MAIL ADDRESS *(Optional)* mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name)* Plaintiff | FOR COURT USE ONLY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS 400 McAllister Street
MAILING ADDRESS San Francisco, CA 94102
CITY AND ZIP CODE
BRANCH NAME:

PLAINTIFF/PETITIONER: Contra Costa Water District

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., Christopher M.
O'Meara, Joseph M. Gregory, Erin Callan, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER<br>CGC-09-489381 |
|---|---|

TO *(insert name of party being served):* Richard S. Fuld, Jr.

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: 6/17/09

Mark C. Molumphy
(TYPE OR PRINT NAME)                    (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing):*
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify):* Civil Cover Sheet, ADR Court Packet and Notice of Case
   Management Conference

*(To be completed by recipient):*
Date this form is signed: June 17, 2009

James G. Kreissman
(on behalf of Richard S. Fuld, Jr.)
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,          (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)          ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Legal<br>Solutions<br>Plus | Code of Civil Procedure,<br>§§ 415.30, 417.10 |

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road, Ste. 200<br>Burlingame, CA 94010<br><br>TELEPHONE NO  650-697-6000  FAX NO *(Optional)*  650-697-0577<br>E-MAIL ADDRESS *(Optional)*  mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name)*  Plaintiff | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS San Francisco, CA 94102
CITY AND ZIP CODE
BRANCH NAME

PLAINTIFF/PETITIONER: Contra Costa Water District

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., Christopher M.
O'Meara, Joseph M. Gregory, Erin Callan

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER<br>CGC-09-489381 |
|---|---|

TO *(insert name of party being served)*: Marsh Johnson Evans

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: 6/17/09

lerk  Molumphy
(TYPE OR PRINT NAME)

(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify)*: Civil Cover Sheet, ADR Court Packet and Notice of Case
   Management Conference

*(To be completed by recipient):*
Date this form is signed:  June 17, 2009
James G. Kreissman
(on behalf of Marsh Johnson Evans)

(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL

Legal
Solutions
Plus

Code of Civil Procedure,
§§ 415.30, 417.10

**POS-015**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*<br>Mark C. Molumphy (168009)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road, Ste. 200<br>Burlingame, CA 94010<br><br>TELEPHONE NO · 650-697-6000  FAX NO *(Optional)*  650-697-0577<br>E MAIL ADDRESS *(Optional)* mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name)*. Plaintiff | FOR COURT USE ONLY |

| |
|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco |
| STREET ADDRESS 400 McAllister Street |
| MAILING ADDRESS San Francisco, CA 94102 |
| CITY AND ZIP CODE |
| BRANCH NAME |

| |
|---|
| PLAINTIFF/PETITIONER: Contra Costa Water District |
| |
| DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., Christopher M.<br>O'Meara, Joseph M. Gregory, Erin Callan, et al. |

| | |
|---|---|
| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | CASE NUMBER<br>CGC-09-489381 |

TO *(insert name of party being served)*: Roger S. Berlind

| NOTICE |
|---|
| The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.<br><br>If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below. |

Date of mailing: 6/17/09

Mark C. Molumphy
(TYPE OR PRINT NAME)                    ▶ (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. ☒ A copy of the summons and of the complaint.
2. ☒ Other: *(specify)*: Civil Case Cover Sheet, ADR Court Packet and Notice of Case Management Conference

*(To be completed by recipient)*:
Date this form is signed: June 17, 2009

James G. Kreissman
(on behalf of Roger S. Berlind)
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL** | Legal<br>Solutions<br>Plus | Code of Civil Procedure<br>§§ 415 30, 417 10 |

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road, Ste. 200<br>Burlingame, CA 94010<br><br>TELEPHONE NO 650-697-6000   FAX NO *(Optional)*  650-697-0577<br>E-MAIL ADDRESS *(Optional)*  mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name)*  Plaintiff | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS 400 McAllister Street
MAILING ADDRESS San Francisco, CA 94102
CITY AND ZIP CODE
BRANCH NAME

PLAINTIFF/PETITIONER: Contra Costa Water District

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., Christopher M. O'Meara, Joseph M. Gregory, Erin Callan, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER<br>CGC-09-489381 |
|---|---|

TO *(insert name of party being served)*: John F. Akers

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:  6/17/09

Mark C. Molumphy
(TYPE OR PRINT NAME)                    ►         (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify)*: Civil Case Cover Sheet, ADR Court Packet and Notice of Case Managment Conference

*(To be completed by recipient):*
Date this form is signed:  June 17, 2009
James G. Kreissman
(on behalf of John F. Akers)
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)          ►      (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev January 1, 2005]

NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL

Legal
Solutions
& Plus

Code of Civil Procedure,
§§ 415.30, 417.10

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road, Ste. 200<br>Burlingame, CA 94010<br><br>TELEPHONE NO.: 650-697-6000   FAX NO. *(Optional)*: 650-697-0577<br>E-MAIL ADDRESS *(Optional)*: mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name)*: Plaintiff | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: San Francisco, CA 94102
CITY AND ZIP CODE:
BRANCH NAME:

PLAINTIFF/PETITIONER: Contra Costa Water District

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., Christopher M.
O'Meara, Joseph M. Gregory, Erin Callan, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER<br>CGC-09-489381 |
|---|---|

TO *(insert name of party being served)*: <u>Christopher M. O'Meara</u>

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: 6/17/09

Mark C. Molumphy
(TYPE OR PRINT NAME)                          ▶  (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify)*: Civil Case Cover Sheet, ADR Court Packet and Notice of Case
   Management Conference

*(To be completed by recipient):*
Date this form is signed: June 17, 2009
   James G. Kreissman
   (on behalf of Christopher M. O'Meara)
                                              ▶
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,          (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)          ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Legal<br>Solutions<br>ʟᴀPlus | Code of Civil Procedure,<br>§§ 415.30, 417.10 |
|---|---|---|---|

CASE NUMBER: CGC-09-489381  CONTRA COSTA WATER DISTRICT VS. RICHARD S. FULI

## NOTICE TO PLAINTIFF

A Case Management Conference is set for

**DATE:**    **NOV-13-2009**

**TIME:**    **9:00AM**

**PLACE:**    **Department 212**
            **400 McAllister Street**
            **San Francisco, CA 94102-3680**

All parties must appear and comply with Local Rule 3.

---

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.

However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management

---

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

### ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL.**
(SEE LOCAL RULE 4)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400  McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3876

See Local Rules 3.6, 6.0 C and 10 D re stipulation to commissioners acting as temporary judges

# Alternative Dispute Resolution (ADR) Program Information Package

# Alternatives to Trial

## There are other ways to resolve a civil dispute.

The plaintiff must serve a copy of the ADR information package
on each defendant along with the complaint.  (CRC 3.221(c))

 **Superior Court of California
County of San Francisco**

# Introduction

**Did you know that most civil lawsuits settle without a trial?**

**And did you know that there are a number of ways to resolve civil disputes without having to sue somebody?**

**These alternatives to a lawsuit are known as alternative dispute resolutions (ADR). The most common forms of ADR are mediation, arbitration and case evaluation. There are a number of other kinds of ADR as well.**

**In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediation, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.**

**ADR is not new. ADR is available in many communities through dispute resolution programs and private neutrals.**

# Advantages of ADR

**ADR can have a number of advantages over a lawsuit.**

- *ADR can save time.* **A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.**

- *ADR can save money.* **Court costs, attorneys fees, and expert fees can be saved.**

- *ADR can be cooperative.* **This means that the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.**

- *ADR can reduce stress.* **There are fewer, if any, court appearances. And because ADR can be speedier, and save money, and because the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads for years.**

- *ADR encourages participation.* **The parties may have more chances to tell their side of the story than in court and may have more control over the outcome.**

- *ADR is flexible.* **The parties can choose the ADR process that is best for them. For example, in mediation the parties may decide how to resolve their dispute.**

- *ADR can be more satisfying.* **For all the above reasons, many people have reported a high degree of satisfaction with ADR.**

Because of these advantages, many parties choose ADR to resolve a dispute, instead of filing a lawsuit. Even when a lawsuit has been filed, the court can refer the dispute to a neutral before the parties' position harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

# Disadvantages of ADR

ADR may not be suitable for every dispute.

- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

- There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

- The neutral may charge a fee for his or her services.

- If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

- Lawsuits must be brought within specified periods of time, known as statutes of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

# ALTERNATIVE DISPUTE RESOLUTION PROGRAMS
## Of the San Francisco Superior Court

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to a mandatory settlement conference or trial." (Superior Court Local Rule 4)

This guide is designed to assist attorneys, their clients and self-represented litigants in complying with San Francisco Superior Court's alternative dispute resolution ("ADR") policy. Attorneys are encouraged to share this guide with clients. By making informed choices about dispute resolution alternatives, attorneys, their clients and self-represented litigants may achieve a more satisfying resolution of civil disputes.

The San Francisco Superior Court currently offers three ADR programs for general civil matters; each program is described below:

1) Judicial Arbitration
2) Mediation
3) The Early Settlement Program (ESP) in conjunction with the San Francisco Bar Association.

## JUDICIAL ARBITRATION

### Description

In arbitration, a neutral "arbitrator" presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case. When the Court orders a case to arbitration it is called judicial arbitration. The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.

Although not currently a part of the Court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties

voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

## *Operation*

Pursuant to CCP 1141.11 and Local Rule 4, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. A case is ordered to arbitration after the Case Management Conference. An arbitrator is chosen from the Court's Arbitration Panel. Most cases ordered to arbitration are also ordered to a pre-arbitration settlement conference. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a court trial within 30 days after the arbitrator's award has been filed.

## *Cost*

There is no cost to the parties for judicial arbitration or for the pre-arbitration settlement conference.

## MEDIATION

## *Description*

Mediation is a voluntary, flexible, and confidential process in which a neutral third party "mediator" facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of the dispute after exploring the significant interests, needs, and priorities of the parties in light of relevant evidence and the law.

Although there are different styles and approaches to mediation, most mediations begin with presentations of each side's view of the case. The mediator's role is to assist the parties in communicating with each other, expressing their interests, understanding the interests of opposing parties, recognizing areas of agreement and generating options for resolution. Through questions, the mediator aids each party in assessing the strengths and weaknesses of their position.

A mediator does not propose a judgment or provide an evaluation of the merits and value of the case. Many attorneys and litigants find that mediation's emphasis on cooperative dispute resolution produces more satisfactory and enduring resolutions. Mediation's non-adversarial approach is particularly effective in disputes in which the parties have a continuing relationship, where there are multiple parties, where equitable relief is sought, or where strong personal feelings exist.

## Operation

San Francisco Superior Court Local Court Rule 4 **provides three different voluntary mediation programs** for civil disputes. An appropriate program is available for all civil cases, regardless of the type of action or type of relief sought.

To help litigants and attorneys identify qualified mediators, the Superior Court maintains a list of mediation providers whose training and experience have been reviewed and approved by the Court. The list of court approved mediation providers can be found at www.sfgov.org/courts.   Litigants are not limited to mediators on the court list and may select any mediator agreed upon by all parties.  A mediation provider need not be an attorney.

Local Rule 4.2 D allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate within 240 days from the date the complaint is filed.  If settlement is not reached through mediation, a case proceeds to trial as scheduled.

## Private Mediation

·The Private Mediation program accommodates cases that wish to ·participate in private mediation to fulfill the court's alternative dispute resolution requirement. The parties select a mediator, panel of mediators or mediation program of their choice to conduct the mediation.  The cost of mediation is borne by the parties equally unless the parties agree otherwise.

Parties in civil cases that have not been ordered to arbitration may consent to private mediation at any point before trial.  Parties willing to submit a matter to private mediation should indicate this preference on the Stipulation to Alternative Dispute Resolution form or the Case Management Statement (CM-110).  Both forms are attached to this packet.

## Mediation Services of the Bar Association of San Francisco

The Mediation Services is a coordinated effort of the San Francisco Superior Court and The Bar Association of San Francisco (BASF) in which a court approved mediator provides three hours of mediation at no charge to the parties. It is designed to afford civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint, in an effort to resolve the matter before substantial funds are expended on the litigation process. Although the goal of the program is to provide the service at the outset of the litigation, the program may be utilized at anytime throughout the litigation process.

The mediators participating in the program have been pre-approved by BASF pursuant to strict educational and experience requirements.

After the filing of the signed Stipulation to Alternative Dispute Resolution form included in this ADR package the parties will be contacted by BASF. Upon payment of the $250 per party administration fee, parties select a specific mediator from the list of approved mediation providers or BASF will help them select an appropriate mediator for the matter. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waiver of the administrative fee based on financial hardship is available.

A copy of the Mediation Services rules can be found on the BASF website at **www.sfbar.org/mediation** or you may call BASF at 415-982-1600.

### Judicial Mediation

The Judicial Mediation program is designed to provide early mediation of complex cases by volunteer judges of the San Francisco Superior Court. Cases considered for the program include construction defect, employment discrimination, professional malpractice, insurance coverage, toxic torts and industrial accidents.

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court Alternative Dispute Resolution Coordinator will coordinate assignment of cases that qualify for the program.

### Cost

Generally, the cost of Private Mediation ranges from $100 per hour to $800 per hour and is shared equally by the parties. Many mediators are willing to adjust their fees depending upon the income and resources of the parties. Any party who meets certain eligibility requirements may ask the court to appoint a mediator to serve at no cost to the parties.

The Mediation Services of the Bar Association of San Francisco provides three hours of mediation time at no cost with a $250 per party administrative fee.

There is no charge for participation in the Judicial Mediation program.

## EARLY SETTLEMENT PROGRAM

### Description

The Bar Association of San Francisco, in cooperation with the Court, offers an Early Settlement Program ("ESP") as part of the Court's settlement conference calendar. The goal of early settlement is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of the dispute. The two-member volunteer attorney panel reflects a balance between plaintiff and defense attorneys with at least 10 years of trial experience.

As in mediation, there is no set format for the settlement conference. A conference typically begins with a brief meeting with all parties and counsel, in which each is given an opportunity to make an initial statement. The panelists then assist the parties in understanding and candidly discussing the strengths and weaknesses of the case. The Early Settlement Conference is considered a "quasi-judicial" proceeding and, therefore, is not entitled to the statutory confidentiality protections afforded to mediation.

### Operation

Civil cases enter the ESP either voluntarily or through assignment by the Court. Parties who wish to choose the early settlement process should indicate this preference on the status and setting conference statement.

If the Court assigns a matter to the ESP, parties may consult the ESP program materials accompanying the "Notice of the Early Settlement Conference" for information regarding removal from the program.

Participants are notified of their ESP conference date approximately 4 months prior to trial. The settlement conference is typically held 2 to 3 months prior to the trial date. The Bar Association's ESP Coordinator informs the participants of names of the panel members and location of the settlement conference approximately 2 weeks prior to the conference date.

Local Rule 4.3 sets out the requirements of the ESP. All parties to a case assigned to the ESP are required to submit a settlement conference statement prior to the conference. All parties, attorneys who will try the case, and insurance representatives with settlement authority are required to attend the settlement conference. If settlement is not reached through the conference, the case proceeds to trial as scheduled.

### Cost

All parties must submit a $250 generally non-refundable administrative fee to the Bar Association of San Francisco. Parties who meet certain eligibility requirements may request a fee waiver. For more information, please contact the ESP Coordinator at (415) 782-9000 ext. 8717.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

For further information about San Francisco Superior Court ADR programs or dispute resolution alternatives, please contact:

Superior Court Alternative Dispute Resolution,
400 McAllister Street, Room 103
San Francisco, CA   94102
(415) 551-3876

or visit the Superior Court Website at
http://sfgov.org/site/courts_page.asp?id=3672

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN FRANCISCO
400 McAllister Street, San Francisco, CA   94102-4514

|  |  |
|---|---|
| Plaintiff<br><br>v.<br><br>Defendant | Case No. _____<br><br>**STIPULATION TO ALTERNATIVE<br>DISPUTE RESOLUTION** |

The parties hereby stipulate that this action shall be submitted to the following alternative dispute resolution process:

☐   **Private Mediation**          ☐   **Mediation Services of BASF**   ☐   **Judicial Mediation**
☐   **Binding arbitration**                                                          Judge _____
☐   **Non-binding judicial arbitration**                                        Judge _____
☐   **BASF Early Settlement Program**
☐   **Other ADR process (describe)** _____

**Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____

_____

_____

---

Name of Party Stipulating                 Name of Party or Attorney Executing Stipulation        Signature of Party or Attorney

☐   Plaintiff       ☐   Defendant.      ☐   Cross-defendant                                     Dated: _____

---

Name of Party Stipulating                 Name of Party or Attorney Executing Stipulation        Signature of Party or Attorney

☐   Plaintiff       ☐   Defendant       ☐   Cross-defendant                                     Dated: _____

---

Name of Party Stipulating                 Name of Party or Attorney Executing Stipulation        Signature of Party or Attorney

☐   Plaintiff       ☐   Defendant       ☐   Cross-defendant                                     Dated: _____

☐   *Additional signature(s) attached*

---

ADR-2  3/06                      **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

**CM-110**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|

| | |
|---|---|
| TELEPHONE NO.: | FAX NO. *(Optional)*. |
| E-MAIL ADDRESS *(Optional)*: | |
| ATTORNEY FOR *(Name)*. | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF |
|---|
| STREET ADDRESS: |
| MAILING ADDRESS: |
| CITY AND ZIP CODE: |
| BRANCH NAME: |

| PLAINTIFF/PETITIONER: |
|---|
| DEFENDANT/RESPONDENT: |

| CASE MANAGEMENT STATEMENT | CASE NUMBER: |
|---|---|
| *(Check one):*  ☐ **UNLIMITED CASE**  (Amount demanded exceeds $25,000)   ☐ **LIMITED CASE**  (Amount demanded is $25,000 or less) | |

| A CASE MANAGEMENT CONFERENCE is scheduled as follows: |
|---|

| Date: | Time: | Dept.: | Div.: | Room: |
|---|---|---|---|---|

Address of court *(if different from the address above)*:

☐ **Notice of Intent to Appear by Telephone, by** *(name)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted jointly by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:
      (3) ☐ have had a default entered against them *(specify names)*:
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served)*:

4. **Description of case**
   a. Type of case in  ☐ complaint  ☐ cross-complaint   *(Describe, including causes of action)*:

Page 1 of 4

**CASE MANAGEMENT STATEMENT**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b. Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5. **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial. *(If more than one party, provide the name of each party requesting a jury trial):*

6. **Trial date**
a. ☐ The trial has been set for *(date):*
b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c. Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7. **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a. ☐ days *(specify number):*
b. ☐ hours (short causes) *(specify):*

8. **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a. Attorney:
b. Firm:
c. Address:
d. Telephone number:
e. Fax number:
f. E-mail address:
g. Party represented:
☐ Additional representation is described in Attachment 8.

9. **Preference**
☐ This case is entitled to preference *(specify code section):*

10. **Alternative Dispute Resolution (ADR)**
a. Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
b. ☐ All parties have agreed to a form of ADR. ADR will be completed by *(date):*
c. ☐ The case has gone to an ADR process *(indicate status):*

**CASE MANAGEMENT STATEMENT**

**CM-110**

| | CASE NUMBER: |
|---|---|
| PLAINTIFF/PETITIONER: | |
| DEFENDANT/RESPONDENT: | |

10. d.    The party or parties are willing to participate in *(check all that apply):*
    (1) ☐ Mediation
    (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)
    (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)
    (4) ☐ Binding judicial arbitration
    (5) ☐ Binding private arbitration
    (6) ☐ Neutral case evaluation
    (7) ☐ Other *(specify):*

    e.  ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.
    f.  ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.
    g.  ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption):*

**11. Settlement conference**
    ☐ The party or parties are willing to participate in an early settlement conference *(specify when):*

**12. Insurance**
    a.  ☐ Insurance carrier, if any, for party filing this statement *(name):*
    b.  Reservation of rights: ☐ Yes ☐ No
    c.  ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**13. Jurisdiction**
Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.
    ☐ Bankruptcy ☐ Other *(specify):*
Status:

**14. Related cases, consolidation, and coordination**
    a.  ☐ There are companion, underlying, or related cases.
        (1) Name of case:
        (2) Name of court:
        (3) Case number:
        (4) Status:
        ☐ Additional cases are described in Attachment 14a.
    b.  ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**15. Bifurcation**
    ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**16. Other motions**
    ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**CASE MANAGEMENT STATEMENT**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

17. **Discovery**
   a. ☐ The party or parties have completed all discovery.
   b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

   Party       Description           Date

   c. ☐ The following discovery issues are anticipated *(specify)*:

18. **Economic litigation**
   a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.
   b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case)*:

19. **Other issues**
   ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify)*:

20. **Meet and confer**
   a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain)*:

   b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify)*:

21. Total number of pages attached *(if any)*: _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

▶

| (TYPE OR PRINT NAME) | (SIGNATURE OF PARTY OR ATTORNEY) |
|---|---|

▶

| (TYPE OR PRINT NAME) | (SIGNATURE OF PARTY OR ATTORNEY) |
|---|---|
| | ☐ Additional signatures are attached. |



# Superior Court of California
## County of San Francisco

<table>
<tr><td>HON. JAMES MCBRIDE<br>PRESIDING JUDGE</td><td><h1>Judicial Mediation Program</h1></td><td>JENIFFER B. ALCANTARA<br>ADR PROGRAM ADMINISTRATOR</td></tr>
</table>

The Judicial Mediation program offers mediation of complex civil litigation by a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

| | |
|---|---|
| The Honorable Anne Bouliane | The Honorable Marla J. Miller |
| The Honorable Robert L. Dondero | The Honorable John E. Munter |
| The Honorable Ernest H. Goldsmith | The Honorable Ronald Quidachay |
| The Honorable Harold E. Kahn | The Honorable A. James Robertson, II |
| The Honorable Patrick J. Mahoney | The Honorable John K. Stewart |
| The Honorable Tomar Mason | The Honorable Mary E. Wiss |
| The Honorable Kevin M. McCarthy | |

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program and deliver a courtesy copy to Dept. 212. A preference for a specific judge may be indicated but specific request are not guaranteed. Please allow at least 30 days for scheduling. The court Alternative Dispute Resolution Program Administrator will facilitate assignment of cases that qualify for the program.

Note: Space is limited. Submission of a stipulation to judicial mediation does not guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
(415) 551-3876

3/09 (mt)



**PROCEDURES, FORMS, MEDIATOR BIOGRAPHIES AND PHOTOGRAPHS:**

# www.sfbar.org/mediation

QUESTIONS?
## adr@sfbar.org or 415-982-1600

- Business
- Civil Rights
- Commercial
- Construction
- Contracts
- Disability
- Discrimination
- Education
- Employment/Workplace
- Environmental
- Family
- Fee Disputes
- Financial
- Gay/Lesbian/Bisexual/Transgender Issues
- Government
- Insurance
- Intellectual Property
- Intra-Organizational
- Labor
- Landlord/Tenant
- Land Use
- Malpractice:
- Legal-Medical-Professional
- Partnership Dissolutions
- Personal Injury
- Probate/Trust
- Products Liability
- Real Estate
- Securities
- Taxation
- Uninsured Motorist
- Women's Issues
- And more...

## What is BASF's Mediation Service?

Mediation is a voluntary, private dispute resolution process in which a trained mediator assists the parties in reaching an outcome that is mutually agreeable.

Mediation Services was established by The Bar Association of San Francisco (BASF) with extensive input from experienced mediators, litigators and judges. This traditional mediation service is an approved alternative to court ordered Arbitration or Early Settlement.

## How Does it Work?

BASF's Mediation Services works quickly, matching a qualified mediator to a case within days. The assignment process is flexible; experienced BASF staff can suggest a mediator, or you can request three biographies to choose from, or request a particular mediator from our Web site.

## How Much Does the Service Cost?

Mediators generously provide one-hour of preparation and two hours of session time free of charge as a service to BASF and the community. To qualify for the pro-bono hours, parties must file the Consent to Mediate form with BASF. Hourly fees beyond the first three hours vary depending on the mediator selected. BASF charges a small administrative fee, which pays for the costs of running the program.

## Who Can Use the Service?

The service can be utilized by anyone whether or not the dispute has been filed in a court. If a legal action is already underway, it can be used at any time during the litigation process and is not limited to San Francisco County litigants.

## Who Are the Mediators?

Experienced mediation professionals are available to assist in most areas of dispute, ranging from multi-party commercial matters to individuals in conflict. Each has been pre-approved pursuant to strict educational and experience requirements. In fact, our mediators average 15 years of mediation experience and 125 hours of formal mediation training.

## More Information

Our Web site - www.sfbar.org/mediation - provides photographs, short biographies and hourly rates of our mediators. You can search by name or by area of law.

If you don't see the area you need in our 30+ panels, just contact us at adr@sfbar.org; it is very likely we can match your need with one of our panelists.

WWW.SFBAR.ORG/MEDIATION • ADR@SFBAR.ORG • 415.982.1600